**2023 UT App 136**

# THE UTAH COURT OF APPEALS

FARM BUREAU MUTUAL INSURANCE,
Appellant and Cross-appellee,

*v.*

JARED H. WESTON, FARMERS INSURANCE EXCHANGE, PREMATIC
SERVICE CORPORATION, AND WILSON GREEN INSURANCE AGENCY,
Appellees and Cross-appellants.

Opinion
No. 20180699-CA
Filed November 9, 2023

Third District Court, Salt Lake Department
The Honorable Royal I. Hansen
No. 050905850

Trent J. Waddoups, Attorney for Appellant and
Cross-appellee Farm Bureau Mutual Insurance

Troy L. Booher, Beth E. Kennedy, and
Dick J. Baldwin, Attorneys for Appellees and
Cross-appellants Farmers Insurance Exchange and
Wilson Green Insurance Agency

Daniel F. Bertch, Attorney for Appellee and
Cross-appellant Jared H. Weston

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGE RYAN D. TENNEY concurred. JUDGE RYAN M. HARRIS
concurred in Parts I, II, III.A, III.B.2, IV, and V,
but dissented as to Parts III.B.1 and III.B.3, with opinion.

ORME, Judge:

¶1     This appeal is multifaceted. The threshold issue concerns
whether an insurance policy Farmers Insurance Exchange

(Farmers Insurance[1]) provided on a vehicle was in effect at the time the vehicle was involved in an accident in which the other driver was killed. Following the first bench trial in this case, the trial court held that Farmers Insurance had properly cancelled the policy prior to the accident for failure to timely pay a premium. Despite this ruling, the issue remained whether Farmers Insurance nonetheless breached its duty to defend when it failed to offer a defense for Jared H. Weston (Jared)—the driver of the vehicle it periodically insured—in a lawsuit Farm Bureau Mutual Insurance (Farm Bureau) initiated as the subrogee of the deceased driver. The trial court held on summary judgment that Farmers Insurance breached the duty to defend and, following a second bench trial, the court awarded Jared $320,000 in damages for emotional distress plus an additional $128,000 in attorney fees for that breach. On reconsideration, the court reduced the damages award to $0 and entered judgment in Jared's favor for $105, representing only Jared's costs. The parties raise several issues on appeal.

¶2     First, we hold that the arguments Farm Bureau and Jared raise on appeal are not moot, and we therefore have jurisdiction to consider them. We then affirm the trial court's determination that Farmers Insurance properly cancelled the insurance policy prior to the accident and certain other of the court's summary judgment rulings. Finally, we turn to the issues concerning the duty to defend. We affirm the court's ruling that Farmers Insurance breached the duty to defend and that Jared is not entitled to damages for emotional distress, but we hold that Jared is entitled to damages in the amount of the judgment entered against him in favor of Farm Bureau plus attorney fees.

---

1. "Farmers Insurance" refers interchangeably to Farmers Insurance Exchange in its individual capacity and to Farmers Insurance Exchange, Prematic Service Corporation, and Wilson Green Insurance Agency, collectively.

BACKGROUND[2]

*Insurance Policy*

¶3    Joelyn Weston (Joelyn) purchased multiple automobile insurance policies from Farmers Insurance, including one for her 1992 Ford Explorer. On several occasions, Joelyn[3] was late in paying the insurance premiums, resulting in several lapses in coverage after Farmers Insurance sent notices of cancellation. In September 2003, Farmers Insurance sent Joelyn one such notice of cancellation, requiring payment on or before September 16. Because Farmers Insurance did not receive full payment until October 3, Joelyn's vehicles were not insured from September 16 until October 3, when Joelyn reinstated the policies.

¶4    That December, a new six-month period of coverage began for Joelyn's vehicles. The declarations page of the policy provided

---

2. This appeal arises from the trial court's grant of summary judgment and from its findings of fact and conclusions of law following two bench trials. Accordingly, "in reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts [corresponding to those issues] accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (quotation simplified). And "on appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts [corresponding to those issues] consistent with that standard and only present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *Linebaugh v. Gibson*, 2020 UT App 108, n.5, 471 P.3d 835 (quotation simplified).

3. Because Jared and Joelyn Weston share the same last name, we refer to them by their first names, with no disrespect intended by the apparent informality.

that the coverage for the vehicles, including for the 1992 Ford Explorer, was for a six-month period beginning on December 3, 2003, and extending until June 3, 2004. The policy provided that "[t]his policy with the Declarations includes all agreements between you and us" and that "[n]o other change or waiver may be made in this policy except by endorsement, new Declarations or new policy issued by us."

¶5      Instead of paying the entire amount due for the six-month period upfront, Joelyn elected to make monthly payments. Accordingly, Endorsement E0022 was incorporated into the policy. Endorsement E0022 stated that "[t]his endorsement is part of your policy" and that it "supersedes and controls anything to the contrary." Endorsement E0022 amended the policy period "to one Calendar month" and provided that "[t]he premium is due no later than on the expiration date of the then current monthly period." Following the first bench trial, the trial court found that Endorsement E0022 also incorporated into the insurance contract the Prematic Service Corporation Monthly Payment Plan Agreement (the Prematic Agreement). The trial court found that Prematic Service Corporation (Prematic) "is a billing system that bills for the Farmers Policies"; that Prematic is entirely owned by Farmers Group, Inc.; and that "all Prematic's employees are full-time employees of Farmers Group, Inc."

¶6      Under the Prematic Agreement, Joelyn, who was referred to as "Customer" in the agreement, agreed to appoint Prematic as her "agent to budget monthly payment of premiums . . . during the term of [the Prematic Agreement] and to make premium payments to insurers . . . pursuant to the terms and conditions of this Agreement." She further agreed "to forward to Prematic by the due dates set forth in the bill sent by Prematic . . . a sum equal to the current monthly payment of the policy(ies) budgeted for monthly premium payment under this Agreement and a service charge."

¶7 Pursuant to Endorsement E0022 and the Prematic Agreement, each monthly payment was due on the third of each month. The first Prematic bill was for a period of 45 days of coverage, and each subsequent bill was for a monthly period of coverage.[4] This, "by design" according to the trial court, "resulted

---

4. The trial court found that "[t]he Prematic billing was calculated so that payments were made approximately forty-five (45) days before the premium payment was due to" Farmers Insurance. Farmers Insurance argues that this finding was not supported by the evidence. We need not address this issue. On appeal, both Jared and Farm Bureau agree that Prematic's billing practice—whatever it was—resulted in an approximate 15-day cushion. Jared asserted that "the Prematic billing platform billed 15 days in advance of the period of coverage billed for." Similarly, Farm Bureau stated that the initial bill charged for a sum that equaled "half the amount" of "a monthly premium installment . . . as a cushion."

Indeed, the evidence of record demonstrates that although Prematic's first bill for the six-month policy period at issue here was sent out 45 days in advance and reflected 45 days of coverage, that first bill "bill[ed] out until December 17th," which was only approximately 15 days into the new policy period that began on December 3, 2003. Thus, only about 15 of the days billed were attributable to the new policy period and the remaining billed days went toward the prior policy period that ended on December 2. Prematic thereafter billed for a month's worth of coverage each subsequent month, resulting in an approximate 15-day buffer to cover the ten days of coverage Farmers Insurance was statutorily required to provide following the mailing of a notice of cancellation for failure to pay the premium when due. *See* Utah Code Ann. § 31A-21-303(2)(c)(ii) (LexisNexis Supp. 2022). Farmers Insurance's records coordinator testified to that effect, and this is also consistent with Prematic's practice of billing for coverage periods starting on the 18th of one month and ending on

(continued…)

in a practice of prepayment of insurance premiums that would lead to a refund of insurance premiums, rather than a bill for unpaid insurance premiums, upon termination or cancellation of the policy."

¶8      Prematic reserved the right to terminate the Prematic Agreement "in the event that . . . Customer has failed to make timely payments to Prematic." The Prematic Agreement further provided,

> In the event that less than full monthly payment is received by Prematic, . . . Customer authorizes Prematic to apply any funds received or credited to Customer's accounts as follows:
>
> (a) first, toward any unpaid balance from a prior month;
>
> (b) second, to the current Service Charge as reflected on the current Prematic bill;
>
> (c) third, toward the payment of any other fees or charges shown on the current Prematic bill; and
>
> (d) [fourth,] toward the payment of current monthly premium amounts for any policy(ies) under this Agreement, applied pro rata.
>
> Customer acknowledges that less than full payment constitutes breach of this Agreement and that Prematic has the right to terminate this Agreement[.]

---

the 17th of the next month. It also appears to be consistent with the refund amount of $130.68 that Farmers Insurance sent Joelyn following termination of the policy. *See infra* note 21.

*Cancellation of the Insurance Policy*

¶9 In December 2003, Joelyn received a bill in the amount of $158.92 for what the bill purported to be the coverage period from January 18, 2004, until February 17, 2004, for four vehicles, including the 1992 Ford Explorer. The bill stated that it was for "Activity processed after: 12-14-03." Payment was due January 3, 2004, which Joelyn did not timely pay, later explaining that she "[p]robably didn't have the money at the time." Sometime after January 6 but before January 15, she mailed a check dated January 6, 2004, for $158.92. Prematic processed the check on January 15, and payment on the check was withdrawn from Joelyn's bank account on January 16.

¶10 On January 14, the day before her check was processed, Farmers Insurance issued a notice of cancellation (the Notice of Cancellation) to Joelyn. The Notice of Cancellation indicated that it "Includes Activity Processed Before: 1-14-04" and stated that Joelyn's policies, including the one for the 1992 Ford Explorer, would be cancelled on February 3, 2004, if payment in the amount of $220.16 was not received by that same date.[5] Joelyn received the Notice of Cancellation "sometime before the February 3, 2004 cancellation date." The trial court later found that Joelyn's "history of late payments and cancellations demonstrates she understood that failure to pay the full amount due as set forth in the . . . Notice of Cancellation would result in cancellation of the insurance policy with no right to retroactive reinstatement." In other words, Joelyn "read and understood . . . that if $220.16 was

---

5. The $220.16 amount reflected the $158.92 due by January 3, 2004, plus the amount due in the bill for the following month—due by February 3, 2004, and covering the period between February 18, 2004, and March 17, 2004—minus a $81.88 "credit for a coverage change to a 1989 motorhome."

not paid by February 3, 2004, all of the Farmers' Policies would be cancelled as of February 3, 2004."

¶11   Although Prematic processed the $158.92 check on January 15, it did not receive the remaining $61.24 due under the Notice of Cancellation by the February 3 deadline. For this reason, on February 14, Farmers Insurance cancelled all of Joelyn's policies for non-payment, effective February 3. The trial court later found that "[b]ased on her history of late payments and cancellations Joelyn Weston understood that her payment of $158.92 . . . and Farmers' subsequent processing of her payment did not satisfy the terms outlined in the . . . Notice of Cancellation." On February 18, Prematic mailed Joelyn a letter stating that because she had not made timely payment, it was cancelling her policies pursuant to the Prematic Agreement. It also noted that Farmers Insurance "has cancelled your policy, or policies, in accordance with the terms of each policy." Prematic's letter also included a refund check for $130.68, which represented the $158.92 payment minus the amount due to Farmers Insurance for the coverage it provided until February 3 plus certain credits Joelyn was owed for changes made to a policy on a different vehicle.

*The Accident*

¶12   On February 15, Jared, Joelyn's son, was involved in an automobile accident while driving the 1992 Ford Explorer. The driver of the other vehicle involved in the accident was killed. Joelyn met with her Farmers Insurance agent the following day, and the agent informed her that the insurance policy for that vehicle had been cancelled effective February 3. Joelyn paid to reinstate her insurance policies that day, but they were not reinstated retroactively to February 3.

¶13   The driver killed in the accident was insured by Farm Bureau. Farm Bureau alleged in its subsequent complaint that it paid a total of $111,688.96 in property damages, personal injury

protection benefits, and uninsured motorist benefits to the driver's heirs, whereupon Farm Bureau became their subrogee.[6]

*The Lawsuit and the 2009 Judgment*

¶14 In March 2005, Farm Bureau filed its complaint in this matter, asserting a negligence claim against Jared.[7] It also joined as defendants Farmers Insurance, the agent who wrote the Farmers Insurance policy for Joelyn, and Prematic. Farm Bureau sought declaratory judgment that Farmers Insurance's policy covering the 1992 Ford Explorer was in effect at the time of the accident. Jared—represented by counsel he personally hired—filed a crossclaim against Farmers Insurance alleging, among other things, breach of contract, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing. In its answer, Farmers Insurance raised as a defense, in relevant part, that the insurance policy had been cancelled effective February 3, 2004, and it asserted that it was "entitled to a judgment, as a matter of law, ruling that there is no cause of action against [Farmers Insurance] and that [Farmers Insurance] owe[s] no obligation to provide insurance coverage on behalf of Jared Weston with respect to the subject accident."[8]

---

6. "The doctrine of subrogation allows an insurer, having paid a loss resulting from a peril insured against, to step into the shoes of its insured and recoup its losses from a tort-feasor whose negligence caused the loss." *Birch v. Fire Ins. Exch.*, 2005 UT App 395, ¶ 7, 122 P.3d 696 (quotation simplified).

7. Farm Bureau did not name Joelyn as a defendant in its lawsuit.

8. The complicated nature of the underlying dispute and the multi-faceted nature of this litigation have made for strange bedfellows. Initially, Farm Bureau and Jared were adversaries,

(continued…)

¶15   In 2008, Jared and Farm Bureau arbitrated the issues of liability regarding the accident. The arbitrator found that Jared was at fault and liable to Farm Bureau in the amount of $684,276.36.[9] On March 26, 2009, the trial court confirmed the

---

with Jared resisting Farm Bureau's claim that he was responsible for the death of its insured, the driver of the other vehicle involved in the accident. When Jared lost that battle, he and Farm Bureau became natural allies in the quest to prove that the Farmers Insurance policy was in effect at the time of the accident involving the 1992 Ford Explorer. Both would benefit if they prevailed on this claim because Jared would have coverage for the judgment obtained against him by Farm Bureau and Farm Bureau would have a ready source of payment of that judgment via Farmers Insurance. But after the trial court determined that Farmers Insurance properly cancelled the policy prior to the accident, it further determined that Farm Bureau no longer had standing to litigate the remaining duty to defend issue because the duty "flows directly from" Farmers Insurance to Jared. Farm Bureau challenges the court's standing determination on appeal. Conversely, Farmers Insurance argues that Farm Bureau lacks standing to litigate this issue. Jared, who undoubtedly has standing to litigate this issue, defends the court's separate ruling that Farmers Insurance breached its duty to defend Jared. *See infra* note 28. In one other side skirmish regarding whether the judgment Farm Bureau obtained against Jared had expired, Farmers Insurance and Jared joined forces against Farm Bureau. *See infra* note 11.

9. This amount reflected $6,375 in funeral costs, $10,184.36 in property damages, $217,717 in economic loss, and $450,000 in non-economic loss. We note the significant discrepancy between this arbitration award and the $111,688.96 amount Farm Bureau alleged in its complaint to have paid to the driver's heirs. An explanation for this discrepancy has not been provided in the

(continued…)

arbitration award, *see* Utah Code Ann. § 78B-11-123 (LexisNexis 2018), and entered judgment against Jared in favor of Farm Bureau in the amount of $747,233.15 (the 2009 Judgment), which represented the arbitration award plus pre-judgment interest and costs, *see id.* § 78B-11-126(1).[10] The 2009 Judgment further provided that it "shall be augmented in the amount of reasonable costs and attorney fees expended in collecting said Judgment by execution or otherwise as shall be established by affidavit." Farm Bureau has not renewed this judgment since it was first entered.[11]

---

briefing and is not readily discoverable in the record, but it has no bearing on the issues before us.

10. Because the applicable provisions of the Utah Code in effect at the relevant times do not materially differ from those currently in effect, we cite the current version of the code for convenience.

11. In 2016, Farm Bureau filed an application for a writ of execution to enforce the 2009 Judgment. The trial court issued the writ in April 2016, and a constable subsequently attempted to seize Jared's vehicle and other possessions. Jared's counsel had numerous discussions with Farm Bureau concerning its collection efforts.

In 2018, Farm Bureau moved the trial court for an award of costs and a proposed amended judgment, seeking $11,423.04 in additional costs. Farmers Insurance and Jared opposed the motion, arguing that the judgment had expired in 2017—eight years after it was initially entered. The court rejected this argument, ruling that the 2009 Judgment "was not a final judgment under rule 54(b)" of the Utah Rules of Civil Procedure and it "may therefore properly be augmented to include the costs requested in Farm Bureau's" motion. After finding that Farm Bureau's requested costs were reasonable, the court amended the judgment to include that amount.

*Partial Summary Judgment and the First Bench Trial*

¶16    In June 2008, Farmers Insurance sought partial summary judgment that it did not breach the covenant of good faith and fair dealing because its denial of coverage was "fairly debatable." Jared did not oppose the motion, later explaining that he "chose not to engage" because, in his view, those arguments were "irrelevant" in the third-party breach of fiduciary duty context. The trial court granted Farmers Insurance's motion on the ground that the motion showed that Jared had "not identified facts supporting his bad faith claim." The court ruled that because Jared did not oppose the motion, he had not shown that a genuine issue of material fact barred summary judgment.

¶17    In 2013, the case then proceeded to a bifurcated bench trial. At issue in the first phase of the trial was whether the insurance policy covering the 1992 Ford Explorer was in effect at the time of the accident. After four days of trial, the trial court concluded that Endorsement E0022 and the Prematic Agreement "supersede any provisions in the original policy contrary to the Endorsement" and that the Prematic Agreement "was effectively a contract with" Farmers Insurance because "Prematic is merely a billing platform for" Farmers Insurance. The court further held that Joelyn's payment of $158.92 was not timely because it was mailed "sometime after January 6, 2004," which was past the January 3 due date. The court accordingly concluded that to receive coverage beyond the date specified in the Notice of Cancellation, Joelyn was required to pay what remained of the $220.16 amount. And because Joelyn did not pay the remaining balance on or before the cancellation date, the court concluded that Farmers Insurance "properly canceled the insurance policy pursuant to the terms outlined in the . . . Notice of Cancellation and the policy provisions" and that Jared "was not insured by Farmers for the operation of the 1992 Ford Explorer on February 15, 2004."

*Summary Judgment and the Second Bench Trial*

¶18   Following the first bench trial, Farmers Insurance and Farm Bureau filed motions for summary judgment on the issue of whether Farmers Insurance breached its duty to defend Jared against Farm Bureau's lawsuit. The court ruled that because Farm Bureau alleged in its complaint that Farmers Insurance "had not complied with the statutory requirements before cancelling the . . . insurance coverage for non-payment," Farmers Insurance "was required to defend until the uncertainties could be resolved against coverage." The court further held that although it "ultimately found that the cancellation notice was sufficient to preclude Farmers' duty to indemnify, Farmers may not now rely on the Court's findings to avoid its duty to defend." Accordingly, the court held that "by simply denying [Jared's] tender of defense,[12] Farmers breached its duty to defend." The court, however, ruled that genuine issues of material fact precluded summary judgment on the issue of the damages resulting from Farmers Insurance's breach of its duty to defend Jared.

¶19   On subsequent motions for summary judgment, the court also ruled that because the coverage issue was resolved in favor of Farmers Insurance, Farm Bureau no longer had standing to litigate the duty to defend issue, which obligation "flows directly from" Farmers Insurance to Jared. The court also dismissed, with prejudice, Jared's claims against Prematic on the ground that the

---

12. "'Tender of defense' describes a common-law practice in which a person or entity against whom an action is brought gives notice of the suit to a person or entity that may ultimately be liable for payment of the judgment, by contract or implication of law." *Summerhaze Co. v. Federal Deposit Ins. Corp.*, 2014 UT 28, ¶ 3 n.2, 332 P.3d 908. "The purpose is to offer the person who may ultimately be liable the opportunity to appear and defend the action, because the person or entity may be bound by the judgment." *Id.* (quotation simplified).

claims were precluded by the court's prior determination "that both Farmers and Prematic complied with the Prematic Agreement in applying" Joelyn's $158.92 payment.

¶20 The case then proceeded to a second bench trial on the issue of damages arising from Farmers Insurance's breach of the duty to defend. The court found that Farmers Insurance's breach of the duty to defend "left [Jared] in a state of great worry and anxiety after the Accident" until he retained counsel in June 2005.[13] Under the executed attorney/client contract, Jared was obligated to pay counsel "a contingency fee of 40% of the total present value of the settlement or judgment" but was not obligated to pay any attorney fees if there was no recovery. The court noted that Jared "has had no complaints about his attorneys," "has had full confidence in [his attorneys], . . . has been satisfied with his attorneys' work and efforts on his behalf, and . . . believes that his attorneys have done a good job in all aspects of the defense of the Accident."

¶21 Concerning the 2009 Judgment entered against Jared, the court stated that Jared presented "no evidence that a different outcome would have resulted had Farmers accepted [Jared's] tender of defense." The court held that Jared did not incur any fees under the contingency fee agreement because he did not obtain a recovery. Additionally, because Jared presented only spreadsheets that the court ruled inadmissible, the court noted that Jared "presented no evidence at trial of attorney fees and costs incurred in defense of the underlying action."

---

13. The court further found that although Jared "has continued to experience emotional distress and anxiety" after retaining counsel, "such emotional distress and anxiety is attributable solely to [Jared's] potential liability in the underlying case and not to Farmers' breach of the duty to defend."

¶22   The court did, however, award Jared $20,000 per month in damages for the mental anguish he suffered from the time of the accident until he retained counsel, totaling $320,000. The court also awarded an additional $128,000 in attorney fees as consequential damages, representing the 40% that Jared would owe under the contingency fee agreement for his mental anguish award.

¶23   Farmers Insurance subsequently moved to amend the court's judgment, arguing, among other things, that Jared "failed to present sufficient evidence of his damages." The court agreed, ruling that Jared's mental anguish "was actually caused by the amount of the judgment and the lack of insurance coverage therefor, and not by Farmers' failure to provide [Jared] a defense in this matter." The court stated that Jared's "intermingling of the duty to defend issue with the issues of liability and coverage improperly leaves the fact-finder to speculate regarding which damages were actually caused by Farmers' breach of the duty to defend." For this reason, the court held that Jared "has . . . failed to prove the fact of damages—he has failed to present evidence that gives rise to a reasonable probability that he suffered damages caused by Farmers' breach of the duty to defend." The court then reduced the damages award to $0 and later entered judgment in Jared's favor for $105, representing his costs.

¶24   The court then entered the amended judgment in Farm Bureau's favor that reflected an additional $11,423.04 in costs, *see supra* note 11, and the $105 judgment in Jared's favor. Farm Bureau subsequently appealed, and Farmers Insurance and Jared cross-appealed.


ISSUES AND STANDARDS OF REVIEW

¶25   The parties raise several issues on appeal. We first address Farmers Insurance's motion for summary disposition, which challenges this court's jurisdiction to address Farm Bureau's

appeal and Jared's cross-appeal. *See Hayes v. Intermountain GeoEnvironmental Services Inc.*, 2018 UT App 223, ¶ 2, 437 P.3d 650 ("The initial inquiry of any court should always be to determine whether the requested action is within its jurisdiction.") (quotation simplified). We deferred ruling on Farmers Insurance's motion "pending plenary presentation and consideration of the appeal during full briefing." In its motion and later in its brief, Farmers Insurance argues that the 2009 Judgment expired "by operation of the Utah Code" because it was not satisfied, stayed, or renewed in the eight years since its initial entry. Accordingly, Farmers Insurance argues that "Farm Bureau lacks standing and all of the issues it raises are moot" and that "Jared's claim concerning Farmers' duty to indemnify is moot because there is no liability to indemnify." The Utah Uniform Arbitration Act (the UUAA) and our rules of procedure govern whether the judgment at issue was final and enforceable at the time of entry. We review a trial court's interpretation of statutes and rules of procedure for correctness. *See Ross v. Ross*, 2019 UT App 104, ¶ 8, 447 P.3d 104. Furthermore, "the question of whether an order is final and appealable is a question of law." *See Powell v. Cannon*, 2008 UT 19, ¶ 9, 179 P.3d 799 (quotation simplified). Because we ultimately conclude that we have jurisdiction over the challenged issues, we then proceed to consider those issues.

¶26 Farm Bureau and Jared raise several issues relating to the trial court's determination, following the first bench trial, that the policy on the 1992 Ford Explorer was cancelled for nonpayment prior to the accident. "Following a bench trial, we review a trial court's legal conclusions for correctness, according the trial court no particular deference." *Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 23, 507 P.3d 357 (quotation simplified). "We review the court's findings of fact for clear error, granting due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* (quotation simplified).

¶27　Farmers Insurance challenges the court's summary judgment ruling that Farmers Insurance breached its duty to defend Jared. "We review the district court's ultimate grant or denial of summary judgment for correctness. We give no deference to the district court's legal conclusions and consider whether the court correctly decided that no genuine issue of material fact existed." *Phillips v. Skabelund*, 2021 UT App 2, ¶ 15, 482 P.3d 237 (quotation simplified), *cert. denied*, 496 P.3d 713 (Utah 2021).

¶28　Jared raises several challenges regarding the trial court's damages award for Farmers Insurance's breach of its duty to defend. We review the standard employed by the trial court in determining damages for correctness, *see Diversified Striping Sys. Inc. v. Kraus*, 2022 UT App 91, ¶ 46, 516 P.3d 306, but "we review for an abuse of discretion the trial court's determination that [a party] failed to introduce sufficient evidence to establish damages, and we will not overturn the trial court's decision unless there was no reasonable basis for the decision," *Macris v. Sevea Int'l, Inc.*, 2013 UT App 176, ¶ 26, 307 P.3d 625 (quotation simplified).

¶29　Jared also argues that the court erred in granting Farmers Insurance's motion for partial summary judgment on Jared's breach of the duty of good faith and fair dealing claim.[14] But

---

14. In addition, Jared argues that the court erred in declaring his $105 judgment against Farmers Insurance satisfied. He argues that the judgment cannot be satisfied because he did not cash the check Farmers Insurance tendered. But because Jared raises this argument solely for the purpose of establishing that he did not waive his right to appeal, *see Scott Anderson Trucking Inc. v. Nielson Constr.*, 2020 UT App 43, ¶ 20, 462 P.3d 822 ("If a judgment is voluntarily paid, which is accepted, and a judgment satisfied, the controversy has become moot and the right to appeal is waived.")

(continued…)

because Jared did not oppose Farmers Insurance's motion below, his challenge is unpreserved. *See Turley v. Childs*, 2022 UT App 85, ¶ 29, 515 P.3d 942. In such cases, "we must review for correctness the question of whether the movant's papers, on their face, indicate that the movant is entitled to judgment as a matter of law." *Id.* We do not consider "any defenses or counter-arguments that the nonmovant might have raised in a never-filed opposition memorandum." *Id.* Furthermore, in reviewing the court's summary judgment ruling, we must assume that the movant's undisputed facts are true. *See id.* ¶ 31.

¶30 Finally, we address Farmers Insurance's argument that the court erred in amending the 2009 Judgment to include $11,423.04 in costs. Farmers Insurance asserts that Farm Bureau's request for fees was untimely under rule 54(d)(2) of the Utah Rules of Civil Procedure. This presents a question of law that we review for correctness. *See Lyon v. Burton*, 2000 UT 55, ¶ 76, 5 P.3d 616.

ANALYSIS

I. Standing and Mootness

¶31 Under rule 10 of the Utah Rules of Appellate Procedure, "[a] party may move at any time to dismiss the appeal or the petition for review on the basis that the appellate court lacks jurisdiction." Utah. R. App. P. 10(a)(1). Standing and mootness both implicate jurisdiction.

¶32 "Standing is a jurisdictional requirement that must be satisfied before a court may entertain a controversy between two parties." *Jones v. Barlow*, 2007 UT 20, ¶ 12, 154 P.3d 808 (quotation simplified). "Under the traditional test for standing, the interests

_____

(quotation simplified), and because Farmers Insurance "agrees that Jared did not waive his right to appeal," we do not reach this issue.

of the parties must be adverse and the parties seeking relief must have a legally protectible interest in the controversy." *Id.* (quotation simplified). *See Washington County Water Conservancy Dist. v. Morgan*, 2003 UT 58, ¶ 20, 82 P.3d 1125 (stating that the traditional test for standing "requires a plaintiff to show some distinct and palpable injury that gives rise to a personal stake in the outcome of the dispute") (quotation simplified).

¶33 Similarly, the mootness doctrine "is a constitutional principle limiting our exercise of judicial power under article VIII of the Utah Constitution" and "is not a simple matter of judicial convenience or an ascetic act of discretion." *Transportation All. Bank v. International Confections Co.*, 2017 UT 55, ¶ 14, 423 P.3d 1171 (quotation simplified). "An appeal is moot if . . . circumstances change so that the controversy is eliminated, thereby rendering the relief requested impossible or of no legal effect," *Walker I Invs., LLC v. Sunpeak Ass'n, Inc.*, 2015 UT App 216, ¶ 7 n.1, 359 P.3d 675 (quotation simplified), thus rendering "anything we might say about the issues . . . purely advisory," *Transportation All. Bank*, 2017 UT 55, ¶ 15 (quotation simplified). For this reason, "in the absence of a justiciable controversy," we lack jurisdiction to decide the appeal.[15] *Id.* (quotation simplified).

¶34 Farmers Insurance argues that we should dismiss Farm Bureau's appeal for lack of standing and on grounds of mootness because Farm Bureau's legal interest in this case arose and was

---

15. An exception to the mootness doctrine exists "when the case: (1) affects the public interest, (2) is likely to recur, and (3) because of the brief time that any one litigant is affected, is likely to evade review." *Timothy v. Pia, Anderson, Dorius, Reynard & Moss, LLC*, 2019 UT 69, ¶ 32, 456 P.3d 731 (quotation simplified). Another exception arises when "the party seeking to survive dismissal . . . demonstrate[s] that collateral legal consequences will flow from the challenged issue." *In re J.S.*, 2017 UT App 5, ¶ 11, 391 P.3d 358 (quotation simplified). Neither exception is implicated here.

dependent on the 2009 Judgment, which Farmers Insurance argues expired eight years after its entry, i.e., in 2017. Farmers Insurance also contends that Jared's arguments concerning Farmers Insurance's duty to indemnify him are moot because the underlying judgment against Jared has expired.

¶35    Under section 78B-5-202 of the Utah Code, judgments "shall continue for eight years from the date of entry in a court unless previously satisfied or unless enforcement of the judgment is stayed in accordance with law." *See* Utah Code Ann. § 78B-5-202(1) (LexisNexis 2018). *See also id.* § 78B-2-311 ("An action may be brought within eight years upon a judgment or decree of any court of the United States, or of any state or territory within the United States.").[16] A party may renew a judgment by filing a motion in the original action before the judgment expires.[17] *See id.* § 78B-6-1802; Utah R. Civ. P. 58C(a).

¶36    "'Judgments' covered by [section 78B-5-202(1)] must be the final variety." *Irving Place Assocs. v. 628 Park Ave., LLC*, 2015 UT 91, ¶ 20, 362 P.3d 1241. In other words, "it cannot be said that a nonfinal judgment shall continue for eight years from the date of

---

16. Our Supreme Court has clarified that "there are two different eight-year periods at play in relation to a judgment." *Timothy*, 2019 UT 69, ¶ 9 n.7. "First, section 78B-5-202(1) defines the duration of the judgment itself. Creditors can renew their judgments by filing a motion to renew before the original judgment expires." *Id.* "Second, section 78B-2-311 establishes the statute of limitations to commence a separate action on a judgment." *Id.*

17. These provisions are applicable to judgments entered pursuant to arbitration awards by virtue of Utah Code section 78B-11-126, which states that such "judgment[s] may be recorded, docketed, and enforced as any other judgment in a civil action." Utah Code Ann. § 78B-11-126(1) (LexisNexis 2018).

entry." *Id.* (quotation simplified). To the contrary, nonfinal judgments "would continue for longer—for eight years *after* the eventual entry of a final judgment." *Id.* (emphasis in original). This is because "a judgment cannot be enforced until it is final," *id.* ¶ 22, and section 202(1) stays enforcement of a judgment "in accordance with law," Utah Code Ann. § 78B-5-202(1). Furthermore, "a nonfinal judgment is subject to modification by the district court unless and until it becomes final." *Irving Place*, 2015 UT 91, ¶ 20 n.6. *See id.* (stating that because "a case may remain pending for years between the initial entry of a nonfinal judgment and the ultimate entry of a final one[,] . . . the limitations period cannot begin running on a judgment that is interlocutory in nature").

¶37   The threshold issue in this case is, therefore, whether entry of the 2009 Judgment confirming the arbitration award constituted a final judgment. Farmers Insurance argues that "[a] judgment reflecting a confirmed arbitration award is a judgment under rule 54(a) [of the Utah Rules of Civil Procedure] because the judgment debtor has an appeal of right." Accordingly, Farmers Insurance argues that the 2009 Judgment was "final and enforceable on March 26, 2009, the day it was entered." Farmers Insurance points to the fact that Farm Bureau even sought to enforce the 2009 Judgment against Jared. We disagree.

¶38   Under the final judgment rule, "an appellate court does not have jurisdiction to consider an appeal unless the appeal is taken from a final order or judgment that ends the controversy between the litigants." *Copper Hills Custom Homes, LLC v. Countrywide Bank, FSB*, 2018 UT 56, ¶ 10, 428 P.3d 1133 (quotation simplified). Rule 54(a) of the Utah Rules of Civil Procedure defines "judgment" as "a decree or order that adjudicates all claims and the rights and liabilities of all parties or any other order from which an appeal of right lies." Utah R. Civ. P. 54(a). Rule 54(b) further provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of

fewer than all the parties does not end the action as to any of the claims or parties" and is therefore not an appealable order unless certified by the trial court. *See id.* R. 54(b); *Powell v. Cannon*, 2008 UT 19, ¶ 11, 179 P.3d 799 ("For an order or judgment to be final, it must dispose of the case as to all the parties, and finally dispose of the subject-matter of the litigation on the merits of the case. In other words, it must end the controversy between the litigants, leaving nothing for the court to do but execute the judgment.") (quotation simplified).

¶39　There are three exceptions to the final judgment rule: (1) interlocutory appeals brought under rule 5(a) of the Utah Rules of Appellate Procedure, (2) nonfinal orders properly certified for appeal by the trial court under rule 54(b) of the Utah Rules of Civil Procedure, and (3) instances where "the legislature provides a statutory avenue for appealing nonfinal orders." *Copper Hills*, 2018 UT 56, ¶¶ 13–15 (quotation simplified). Only the third exception is at issue here, pursuant to Utah Code section 78B-11-129(1). *See id.* ¶ 13.

¶40　Section 129(1) appears within the UUAA and provides that in the context of arbitration,

> (1) An appeal may be taken from:
>
> (a) an order denying a motion to compel arbitration;
>
> (b) an order granting a motion to stay arbitration;
>
> (c) an order confirming or denying confirmation of an award;
>
> (d) an order modifying or correcting an award;
>
> (e) an order vacating an award without directing a rehearing; or

(f) a final judgment entered pursuant to [the UUAA].

Utah Code Ann. § 78B-11-129(1) (LexisNexis 2018). "Any ruling listed in subsection 129(1) [gives] the parties an appeal as of right, which should be pursued under rule 3" of the Utah Rules of Appellate Procedure. *Westgate Resorts, Ltd. v. Consumer Prot. Group, LLC*, 2012 UT 56, ¶ 12, 289 P.3d 420. *See* Utah R. App. P. 3(a)(1) ("[A] party may appeal a final order or judgment from a district or juvenile court to the appellate court[.]").

¶41 Farmers Insurance asserts that the 2009 Judgment falls squarely within subsection (c) of section 129(1). We disagree. Subsection (c) provides that "[a]n appeal may be taken from . . . an order confirming or denying confirmation of an [arbitration] award." Utah Code Ann. § 78B-11-129(1)(c) (LexisNexis 2018). The 2009 Judgment is not such an order. Rather, in accordance with the UUAA, the trial court entered the 2009 Judgment *after* it entered a separate order confirming the arbitration award. *See id.* § 78B-11-123 (detailing the process for obtaining an order confirming an arbitration award); *id.* § 78B-11-126(1) ("Upon granting an order confirming . . . an [arbitration] award, the court shall enter a judgment conforming to the award. The judgment may be recorded, docketed, and enforced as any other judgment in a civil action."). Indeed, only subsection (f) of section 129(1) refers to judgments, but it limits appeals to "*final* judgment[s] entered pursuant to [the UUAA]." *Id.* § 78B-11-129(1)(f) (emphasis added). Because the 2009 Judgment did not resolve all the claims of all the parties, it is not a final judgment, *see* Utah R. Civ. P. 54(b), and therefore does not fall under subsection (f).[18] *See Westgate*, 2012 UT 56, ¶ 22. Accordingly, subsection (c)'s "statutory avenue

---

18. And in any event, because subsection (f) deals with final judgments, it is not an exception to the final judgment rule. *See Copper Hills Custom Homes, LLC v. Countrywide Bank, FSB*, 2018 UT 56, ¶ 13, 428 P.3d 1133.

for appealing nonfinal orders," *Copper Hills*, 2018 UT 56, ¶ 13 (quotation simplified), applied to the order confirming the arbitration award but not to the subsequently entered 2009 Judgment.[19]

¶42 In sum, because we conclude that an appeal as of right did not lie from the 2009 Judgment, the 2009 Judgment was not a final judgment under rule 54(a) of the Utah Rules of Civil Procedure and the eight-year period under section 202(1) did not begin to run upon entry of that interlocutory judgment. For these reasons, Farmers Insurance's standing and mootness arguments are unavailing, and we retain jurisdiction to address all the issues raised on appeal.

## II. Cancellation of the Insurance Policy

¶43 Under Utah's Insurance Code, an insurer generally may not cancel a policy for insurance prior to the expiration of the policy term, *see* Utah Code Ann. § 31A-21-303(2)(b)(i)(A) (LexisNexis Supp. 2022), unless, as relevant here, it does so for "nonpayment of a premium when due," *id.* § 31A-21-303(2)(b)(ii)(A). Such cancellation "is effective no sooner than 10 days after delivery or first-class mailing of a written notice to the policyholder." *Id.* § 31A-21-303(2)(c)(ii). Accordingly, so long as the insurer provides written notice of cancellation and

---

19. The fact that Farm Bureau erroneously obtained a writ of execution and attempted to collect on the 2009 Judgment against Jared before it was final and enforceable is immaterial to the issues before us on appeal. "Because there had not been a 'final judgment,' a writ of execution was not available under these circumstances, and the district court could have revisited its decision to grant the writ" at any point. *Jordan Constr., Inc. v. Federal Nat'l Mortgage Ass'n*, 2017 UT 28, ¶ 36, 408 P.3d 296. And it may be that Jared has some recourse against Farm Bureau for its wrongful efforts to execute on his assets.

provides coverage for a 10-day grace period thereafter, the insurer may cancel an insurance policy for a single past due premium payment.

¶44    Consistent with the Insurance Code, the insurance policy on the 1992 Ford Explorer stated that Farmers Insurance may cancel the policy for "fail[ure] to pay the premium when due." It further provided that Farmers Insurance would mail notice of cancellation for nonpayment of the premium "[n]ot less than 10 days prior to the effective date of such cancellation."

¶45    Farm Bureau and Jared raise several challenges to the trial court's determination that Farmers Insurance's cancellation of the policy, effective February 3, 2004, was valid. We address each argument in turn.

A.    Incorporation of the Prematic Agreement

¶46    Farm Bureau first argues that the trial court erred in holding that the Prematic Agreement was incorporated into the policy through Endorsement E0022. Farm Bureau contends that if the Prematic Agreement was, as Farm Bureau asserts, separate from the policy and Endorsement E0022, then Joelyn's failure to timely pay the full $220.16 due under the Prematic bill may have been a breach of the Prematic Agreement, though not of the policy itself. But even assuming, without deciding, that the court did err in this respect, we disagree with Farm Bureau that Joelyn's failure to pay the full amount owed as required by the Notice of Cancellation resulted in cancellation of only the Prematic Agreement and not the policy.

¶47    The policy provided that it may be altered "by endorsement." Endorsement E0022 amended the policy period to "one Calendar month" and provided that "[t]he premium is due no later than on the expiration date of the then current monthly period." Additionally, the declarations page, which is also part of the policy, provided that the monthly period began on the third

of each month. This corresponded with the February 3 due date under the Prematic bill. Accordingly, even if the Prematic Agreement was a separate agreement from the policy, Joelyn nevertheless breached the policy and Endorsement E0022 when she failed to make the full payment of $220.16 by the due date as provided for in the Notice of Cancellation. Indeed, in light of the declarations page providing that the policy began on December 3, 2004, payment under Endorsement E0022 would have been due on the second of each subsequent month, which represented "the expiration date of the then current monthly period." In light of Joelyn's failure to timely pay the $158.92, Farmers Insurance was entitled to cancel the policy for "fail[ure] to pay the premium when due." Instead of doing so, the Notice of Cancellation offered the opportunity for a cure, stating that it would cancel the policy *unless* Joelyn paid $220.16—which represented a combined payment for the January and February monthly periods—by February 3, 2004.[20]

---

20. At oral argument, Farm Bureau suggested that Prematic, not Farmers Insurance, sent the Notice of Cancellation and that it therefore purported to be only a cancellation of the Prematic Agreement and not of the policy. But aside from the question of what purpose could possibly be served by keeping the policy in effect while terminating only the agreement that governed premium payments, the assertion that Prematic sent the Notice of Cancellation is unsupported by the record. To the contrary, the record supports only the conclusion that Farmers Insurance sent the Notice of Cancellation. The Notice of Cancellation made no mention of Prematic. Instead, it mentions Farmers Insurance three times and even lists the name of the Farmers Insurance agent who acted as Joelyn's point of contact with Farmers Insurance. The Notice of Cancellation specifically informed Joelyn, with our emphasis, that "[i]f the minimum amount due is not received by the due date, . . . *your insurance* indicated by the insurance

(continued…)

¶48    Although Joelyn did pay the $158.92 sometime between January 6 and January 15, she failed to pay the full $220.16 by the February 3 deadline. The trial court found that based on Joelyn's "history of late payments and cancellations," she "read and understood" the Notice of Cancellation to mean "that if $220.16 was not paid by February 3, 2004, all of the Farmers' Policies would be cancelled as of February 3, 2004."

¶49    Without receiving full payment from Joelyn, Prematic could not have forwarded the full amount to Farmers Insurance to prevent the cancellation.[21] Accordingly, regardless of whether

---

number(s) listed which has been issued by the undersigned company(ies) will be canceled[.]" Additionally, although the trial court did not specifically find that Farmers Insurance prepared the Notice of Cancellation, it found that it was mailed by a third party that Farmers Insurance "contracted to sort and mail notices prepared at Farmers' [center for printing and mailing]."

For these reasons, Farm Bureau's assertion that Prematic sent the Notice of Cancellation and that it merely cancelled the Prematic Agreement—and not the policy—fails. And for these same reasons, we reject Farm Bureau's argument that the Notice of Cancellation was ineffective because it was sent by Farmers Insurance's affiliate, Prematic, and not by Farmers Insurance.

21. Farm Bureau also argues that Farmers Insurance failed to prove nonpayment of a premium because the Prematic Agreement specified that "payment to Prematic . . . does [not] constitute payment of any premium due from Customer to any insurance company." This provision accompanied another provision stating that Prematic itself was not an insurance company. But it is undisputed that Prematic forwarded the payments to Farmers Insurance as premiums. And as mentioned above, because Joelyn testified and the trial court found that she did not make the payment by the January 3 due date, it was

(continued…)

the Prematic Agreement was integrated into the policy, under the terms of Endorsement E0022 Joelyn was required to pay for each monthly period "no later than on the expiration date of the then current monthly period," and her failure to pay the premium by the February 3 due date was a breach of Endorsement E0022 and of the policy by extension.

---

impossible for Prematic to timely forward the premium payment to Farmers Insurance.

Farm Bureau and Jared also argue that Prematic did hold sufficient funds to pay the remaining $61.24 due under the Notice of Cancellation, as evidenced by its refund check of $130.68. But Farm Bureau and Jared have not carried their burden of persuasion on this issue. *See* Utah R. App. P. 24(a)(8). The calculation of the $130.68 is multifaceted. The trial court's finding on this matter is limited to stating that the refund "was calculated on a daily rate, back to February 3, 2004." Without further explanation of how the $130.68 figure was reached, we are unable to accept the premise that Prematic had an excess of funds sufficient to cover the additional $61.24 due under the Notice of Cancellation. For example, neither party addresses the $81.88 "credit for a coverage change to a 1989 motorhome," which was used to reduce the amount due on the February premium to only $61.24. Farmers Insurance's records coordinator testified that Farmers Insurance issued this credit because Joelyn had overpaid the premium on a motorhome dating back to May 2003, which therefore would have presumably been included in the refund amount, leaving an excess of only $48.80 ($130.68 minus $81.88), and which would have been insufficient to cover the $61.24 left owing under the Notice of Cancellation. Additionally, without offering further explanation or citing to the record, Farm Bureau cites figures that further confuse the matter. Absent sufficient development of this rather technical issue, we are unable to reach the merits of this argument.

B.      Notice of Cancellation

¶50    Farm Bureau and Jared both argue that the Notice of Cancellation was ineffective because (1) Farmers Insurance did not prove that it complied with the Insurance Code by mailing the Notice of Cancellation 10 days prior to the effective date of the cancellation, and (2) it was anticipatory. We address each argument in turn.

1.      Proof of Mailing

¶51    The Insurance Code provides that "[c]ancellation for nonpayment of premium of a personal lines policy is effective no sooner than 10 days after delivery or first-class mailing of a written notice to the policyholder." Utah Code Ann. § 31A-21-303(2)(c)(ii) (LexisNexis Supp. 2022). Farm Bureau and Jared assert that Farmers Insurance did not prove that it mailed the Notice of Cancellation at least 10 days prior to the cancellation date and that the Notice of Cancellation was therefore invalid. We disagree.

¶52    The trial court found that "[o]n January 14, 2004, more than 10 days before February 3, 2004, . . . Joelyn [was] sent a written Notice of Cancellation." This finding is supported by the evidence Farmers Insurance presented at trial in the form of four business records and the testimony of a Farmers Insurance employee. The employee explained that the first record showed that Farmers Insurance generated 9,411 notices of cancellation on January 14, 2004, and that the second record indicated that one of those notices was for Joelyn. The employee further explained that the third record indicated that all 9,411 notices were metered for January 15 and that the fourth record showed that they were picked up by a third party to be sorted and taken to the post office.

¶53    Although, as the court noted, Farmers Insurance presented no evidence as to the "actual mailing date" by the third party, which thus remained unproven at trial, Farmers Insurance

nonetheless presented sufficient evidence from which it could be reasonably inferred that the Notice of Cancellation was mailed at least 10 days prior to cancellation. To comply with the statutory mandate, the third party had to mail the Notice of Cancellation no later than January 24—nine days after receiving it from Farmers Insurance on January 15. The Farmers Insurance employee testified that the third party picked up mail from Farmers Insurance "three or four" times a day. He further testified that Farmers Insurance shrink-wrapped notices of cancellation in blue, which served as a "red flag" to the third party "that this was a priority job" that was to be processed as soon as it arrived at the third-party facility. He also testified that if a problem arose with a particular batch of mailings, he would have been made aware of it—although that had never occurred to date. Finally, though not dispositive, Joelyn testified that she received the Notice of Cancellation "sometime before the February 3, 2004 cancellation date," thereby proving that the third party did, in fact, mail the Notice of Cancellation.

¶54 Based on this evidence, the only reasonable inference is that the third party mailed the Notice of Cancellation, which was marked as "high priority," within the nine-day window between January 15 and January 24. Thus, under the facts of this case, regardless of the fact that Farmers Insurance did not prove the "actual mailing date" at trial, the nine-day window it did establish was sufficiently large to accommodate this uncertainty. For this reason, we affirm the trial court's finding that the Notice of Cancellation was mailed within 10 days of the cancellation date.

2.    Anticipatory Cancellation

¶55 Farm Bureau and Jared argue that the Notice of Cancellation was invalid because it anticipated Joelyn's failure to pay the February premium. But the basis for the Notice of Cancellation was Joelyn's late payment of the *January* premium. In accordance with both the Insurance Code and the terms of

Endorsement E0022, Farmers Insurance issued the Notice of Cancellation for "nonpayment of a premium when due." Utah Code Ann. § 31A-21-303(2)(b)(ii)(A) (LexisNexis Supp. 2022). Although not so obligated, Farmers Insurance offered Joelyn the opportunity to avoid cancellation by paying both the January and February premiums by February 3. The payment of both premiums was therefore a condition of Farmers Insurance not exercising its statutory and contractual right to cancel the policy. And because Joelyn did not comply with that condition, Farmers Insurance then exercised its right to cancel the policy. Farm Bureau and Jared's characterization of the Notice of Cancellation as anticipating the late payment of the February premium is therefore incorrect.

### C.    Partial Payment

¶56    Farm Bureau and Jared next argue that Farmers Insurance lost its right to cancel the policy when it accepted the partial payment of the amount due under the Notice of Cancellation. Specifically, they contend that acceptance of the partial payment (1) constituted a waiver of Farmers Insurance's right to cancel and (2) estopped Farmers Insurance from cancelling the policy. We address each argument in turn.

### 1.    Waiver

¶57    Farm Bureau and Jared argue that Farmers Insurance waived its right to cancel the policy when it accepted partial payment for the coverage period in which the accident occurred.[22]

---

22. Following the first bench trial, the trial court found that "[t]he payment of $158.92 for the December 14, 2003 bill was due on January 3, 2004," and that the bill "was for coverage for the period from January 18, 2004 through February 17, 2004." Farmers Insurance asserts that the trial court's finding regarding the coverage period was clearly erroneous. It contends that no

(continued…)

We do not discuss the parties' arguments in detail because the waiver argument is expressly foreclosed by the terms of the policy. The policy expressly provided, with our emphasis, that "[n]o other change *or waiver* may be made in this policy except by endorsement, new Declarations or new policy issued by us." Accordingly, Farmers Insurance's act of cashing the partial payment could not constitute waiver.[23] *See Mounteer Enters., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, ¶ 19, 422 P.3d 809 ("When a contract contains an antiwaiver provision, a party cannot waive a contractual right merely by failing to enforce the provision establishing that right.").

---

evidence supports this finding and, to the contrary, that the evidence presented at trial actually shows that the "coverage period ran from the third of the month to the second of the following month." Because this finding does not affect the outcome of this appeal, we need not consider this argument.

23. In his reply brief, Jared argues that this policy provision is at odds with the Insurance Code. Specifically, he asserts that Utah Code section 31A-21-303(2)(b) "requires Farmers to accept a late payment, so long as it is tendered within 10 days of a notice of cancellation." But that provision contains no such requirement. Instead, it is limited to providing that an insurer may cancel a policy for "nonpayment of a premium when due." Utah Code Ann. § 31A-21-303(2)(b)(ii)(A) (LexisNexis Supp. 2022). Furthermore, subsection (2)(c)(ii) merely provides that such "[c]ancellation for nonpayment of premium . . . is effective no sooner than 10 days after delivery or first-class mailing of a written notice to the policyholder," *id.* § 31A-21-303(2)(c)(ii), and does not provide that the right to cancel is voided if payment is received within that 10-day period.

2.      Equitable Estoppel

¶58     Jared argues that Farmers Insurance was equitably estopped from cancelling the policy.[24] Specifically, he contends that because Farmers Insurance did not issue another notice of cancellation after it cashed Joelyn's check for $158.92, Joelyn "acted in reliance on Farmers' conduct" that allegedly suggested that she had continuing coverage. But this argument neglects the trial court's finding that "[b]ased on her history of late payments and cancellations Joelyn Weston understood that her payment of $158.92 . . . and Farmers' subsequent processing of her payment did not satisfy the terms outlined in the . . . Notice of Cancellation." Accordingly, in light of this finding—which Jared does not challenge on appeal—Joelyn could not have reasonably relied on Farmers Insurance's act in cashing her partial payment as a basis for believing that the policy was no longer at risk of immediate cancellation.

D.      Retroactivity

¶59     Jared contends that the cancellation was ineffective because it was retroactive. Specifically, Farmers Insurance cancelled the policy on February 14—the day before the fatal accident for which Jared was responsible—retroactive to

---

24. The elements of equitable estoppel are:
> (1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (2) reasonable action or inaction by the other party taken on the basis of the first party's statement, admission, act, or failure to act; and (3) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.

*McLeod v. Retirement Board*, 2011 UT App 190, ¶ 21, 257 P.3d 1090 (quotation simplified).

February 3. In support of this argument, Jared cites a section of the Insurance Code:

> An insurance contract insuring against loss or damage through legal liability for the bodily injury or death by accident of any person, or for damage to the property of any person, may not be retroactively abrogated to the detriment of any third-party claimant *by any agreement between the insurer and insured after the occurrence of any injury, death, or damage for which the insured may be liable.* This attempted abrogation is void.

Utah Code Ann. § 31A-22-202(1) (LexisNexis 2017) (emphasis added). But because the alleged retroactive cancellation occurred neither "by agreement between the insurer and the insured" nor "after the occurrence" of the accident, this statute does not apply to the situation before us. Indeed, even if Farmers Insurance had cancelled the policy effective February 14, the policy still would not have been in effect on February 15 when the accident occurred.

¶60 Similarly, Farm Bureau argues that the policy should have "remained in force through . . . at least the date of the refund." In support of this assertion, Farm Bureau cites Utah Code section 31A-21-305(2)(d), titled "Cancellation upon request of a premium finance company," which provides,

> Whenever a financed insurance policy is cancelled, the insurer shall return any unearned premiums due under the insurance policy to the insurance premium finance company for the account of the insured, and this action by the insurer satisfies the insurer's obligations under the insurance policy which relate to the return of unearned premiums. If the crediting of return premiums to the account of the insured results in a surplus over the amount due

from the insured, the premium finance company
shall refund that excess to the insured if it exceeds
$5.

*Id.* § 31A-21-305(2)(d). The statute is entirely silent on whether the policy remains in place until any refund is issued. Accordingly, we affirm the trial court's determination that Farmers Insurance properly cancelled the insurance policy prior to the accident.[25]

## III. Duty to Defend

¶61    "A policy containing motor vehicle liability coverage imposes on the insurer the duty to defend, in good faith, any person insured under the policy against any claim or suit seeking damages which would be payable under the policy." Utah Code Ann. § 31A-22-303(5) (LexisNexis Supp. 2022). *See* Restatement of the Law of Liability Insurance § 13(1) (Am. Law Inst. 2019) ("An insurer that has issued an insurance policy that includes a duty to defend must defend any legal action brought against an insured that is based in whole or in part on any allegations that, if proved, would be covered by the policy, without regard to the merits of those allegations."). Under this duty, the insurer is required "to protect the insured's interests as zealously as it would its own." *Black v. Allstate Ins. Co.*, 2004 UT 66, ¶ 25, 100 P.3d 1163 (quotation simplified). In the third-party context,[26] the duty to defend is

---

25. In the event we reverse the trial court's ruling that Farmers Insurance properly cancelled the insurance policy on the 1992 Ford Explorer, Farm Bureau seeks an award of attorney fees under Utah Code section 78B-5-825. Because we affirm the court's ruling, we also necessarily reject Farm Bureau's request for attorney fees.

26. In the third-party context, insurers contract "to defend the insured against claims made by third parties against the insured

(continued…)

elevated to a fiduciary duty because "the insurer controls the disposition of claims against its insured, who relinquishes any right to negotiate on his own behalf" and because "the law imposes upon all agents a fiduciary obligation to their principals with respect to matters falling within the scope of their agency." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 799–800 (Utah 1985). *See id.* at 799 (stating that in the third-party insurance context, "the contract itself creates a fiduciary relationship because of the trust and reliance placed in the insurer by its insured").

¶62    "An insurer's duty to defend arises solely under the terms of the" insurance policy, which is "merely a contract between the insured and the insurer." *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2011 UT 49, ¶ 8, 266 P.3d 733 (quotation simplified). *See Fire Ins. Exch. v. Estate of Therkelsen*, 2001 UT 48, ¶ 22, 27 P.3d 555 ("The duty to defend arises solely under contract.") (quotation simplified). Accordingly, when determining whether an insurer has a duty to defend an insured against certain claims, "the test is whether the complaint alleges a risk within the coverage of the policy." *Benjamin v. Amica Mutual Ins. Co.*, 2006 UT 37, ¶ 16, 140 P.3d 1210 (quotation simplified). *See Equine Assisted Growth*, 2011 UT 49, ¶ 8 (stating that the duty to defend "is triggered whenever the insurer ascertains facts giving rise to potential liability under the insurance policy") (quotation simplified).

---

and to pay any resulting liability, up to the specified dollar limit." *M.A. v. Regence BlueCross BlueShield of Utah*, 2020 UT App 177, ¶ 16 n.10, 479 P.3d 1152 (quotation simplified). This stands in contrast to the first-party context, which "refers to an insurance agreement where the insurer agrees to pay claims submitted to it by the insured for losses suffered by the insured." *Id.* (quotation simplified).

¶63    Because "an insurer's duty to defend is broader than its duty to indemnify,"[27] "an insurer may have a duty to defend an insured even if . . . the insurer is ultimately not liable to indemnify the insured." *Estate of Therkelsen*, 2001 UT 48, ¶ 22 (quotation simplified). An insurer may refuse to defend against an action only if "a comparison of the policy with the underlying complaint shows on its face that there is no potential for coverage." *Summerhaze Co. v. Federal Deposit Ins. Corp.*, 2014 UT 28, ¶ 38, 332 P.3d 908 (quotation simplified). But "if the underlying complaint alleges any facts or claims that might fall within the ambit of the policy, the insurer must offer a defense." *Id.* ¶ 36 (quotation simplified). *See Equine Assisted Growth*, 2011 UT 49, ¶ 8 ("Where factual questions render coverage uncertain the insurer must defend until those uncertainties can be resolved against coverage.") (quotation simplified). In other words, "when in doubt, defend." *Benjamin*, 2006 UT 37, ¶ 22 (quotation simplified).

A.    Breach of the Duty to Defend

¶64    Farmers Insurance challenges the trial court's ruling on summary judgment that it breached its duty to defend Jared against Farm Bureau's complaint.[28] The court held that its prior determination that Farmers Insurance had properly cancelled the

---

27. "This is because the duty to indemnify is determined by the underlying facts of the case, while the duty to defend is controlled by the allegations in the complaint against the insured." *Summerhaze Co. v. Federal Deposit Ins. Corp.*, 2014 UT 28, ¶ 36, 332 P.3d 908 (quotation simplified).

28. Farmers Insurance also argues that Farm Bureau lacks standing to litigate this issue. But because Jared—who clearly does have standing—likewise presents argument on the duty to defend, and because we do not base our holding on this issue on any argument solely attributable to Farm Bureau, we need not consider this argument.

insurance policy on the 1992 Ford Explorer prior to the accident was immaterial to this issue because Farm Bureau's complaint alleged that Farmers Insurance "had not complied with the statutory requirements before cancelling the . . . insurance coverage for non-payment" and that Jared was insured by the policy at the time of the accident. Accordingly, the court concluded that Farmers Insurance was "required to defend until the uncertainties could be resolved against coverage"—i.e., until the court determined that Farmers Insurance had properly cancelled the insurance policy—and that by not doing so, Farmers Insurance had breached its duty to defend.

¶65   Farmers Insurance challenges this ruling, contending that an insurer has no duty to defend in the absence of a contract. It asserts that because the insurance contract is the source of the duty to defend, the duty cannot exist if there is no contract. Accordingly, because there was no active policy on the 1992 Ford Explorer at the time of the accident, Farmers Insurance did not have a duty to defend Jared against Farm Bureau's lawsuit. Although we agree that an insurer generally does not have a duty to defend when an event occurs after an insurance policy was cancelled, *see* 14 Steven Plitt et al., *Couch on Insurance* § 201:3 (3d ed. June 2023 update) ("It has been held that an insurer has no duty to defend . . . where the alleged event occurred . . . [b]efore the policy went into effect" or "[a]fter the policy had been cancelled."), we nonetheless hold that because a genuine issue of fact existed regarding whether the insurance policy had been properly cancelled, Farmers Insurance still had a duty to defend Jared until that issue had been resolved in its favor.

¶66   Farmers Insurance is correct that generally "the duty to defend arises solely under contract." *Fire Ins. Exch. v. Estate of Therkelsen*, 2001 UT 48, ¶ 22, 27 P.3d 555 (quotation simplified). As discussed above, it is for that reason that "the duty to defend is controlled by the allegations in the complaint against the insured." *Summerhaze Co. v. Federal Deposit Ins. Corp.*, 2014 UT 28,

¶ 36, 332 P.3d 908 (quotation simplified). Thus, until an insurer can establish that the claims against the insured fall outside of policy coverage, the insurer is obligated to defend an insured in a lawsuit whenever "the complaint alleges a risk within the coverage of the policy." *Benjamin v. Amica Mutual Ins. Co.*, 2006 UT 37, ¶ 16, 140 P.3d 1210 (quotation simplified). *See id.* ¶ 25; *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2011 UT 49, ¶ 8, 266 P.3d 733. For this reason, the duty to defend may exist in situations where "the insurer is ultimately not liable to indemnify the insured." *Estate of Therkelsen*, 2001 UT 48, ¶ 22. We see no reason to stray from these well-established principles in a situation where genuine issues of fact exist regarding whether an existing insurance policy was in effect at the relevant time.

¶67     This holding is likewise in line with the Restatement of the Law of Liability Insurance, which provides:

> An insurer that has the duty to defend . . . must defend until its duty to defend is terminated . . . by declaratory judgment or otherwise, unless facts not at issue in the legal action for which coverage is sought and as to which *there is no genuine dispute* establish that . . . [t]here is no duty to defend because the insurance policy has been properly cancelled.

Restatement of the Law of Liability Insurance § 13(3)(e) (Am. Law Inst. 2019) (emphasis added). *Cf.* 14 Steven Plitt et al., *Couch on Insurance* § 201:3 (3d ed. June 2023 update) (stating that where "doubt exists whether the claim against the insured arguably falls within policy coverage, such doubts must be resolved in favor of the insured"). Thus, an insurer may properly decline to offer a defense on the ground that the insurance policy had been cancelled only when there is no genuine issue of fact regarding the cancellation. This was not the case here.

¶68     There is no question that a contract did exist for Farmers Insurance to insure the 1992 Ford Explorer. Additionally, both

Jared and Farm Bureau alleged that Farmers Insurance improperly cancelled the insurance policy. It was not until after the first bench trial—held some four years after the trial court entered the 2009 Judgment against Jared—that the court resolved this factual dispute in favor of Farmers Insurance. Thus, because a genuine dispute of fact existed regarding whether Farmers Insurance properly cancelled the insurance policy, Farmers Insurance was still obligated to defend Jared until that issue was resolved, and Farmers Insurance breached its duty to defend by failing to do so. *See Equine Assisted Growth*, 2011 UT 49, ¶ 8 ("Where factual questions render coverage uncertain, the insurer must defend until those uncertainties can be resolved against coverage.") (quotation simplified); *Estate of Therkelsen*, 2001 UT 48, ¶ 22 (stating that an insurer may have a duty to defend in situations where "the insurer is ultimately not liable to indemnify the insured").

¶69 Farmers Insurance resists this conclusion and points to our Supreme Court's decision in *McCarty v. Parks*, 564 P.2d 1122 (Utah 1977), in support of its argument that "[i]f there is no policy, there can be no duty to defend." In that case, an Arizona-based employer gave permission to its employee, Parks, to take the company car on a two-to-three-day trip to Flagstaff, Arizona. *See id.* at 1123. But instead of going to Flagstaff, Parks, without the knowledge or consent of the employer, took the car to Salt Lake City, where he was involved in an automobile accident over two months later. *See id.* A party injured in the accident sued Parks, now an ex-employee, and a default judgment was entered against him. *See id.* at 1122–23. A demand for payment was made against the insurer of the employer's vehicle. *Id.* at 1123. On appeal, our Supreme Court, in relevant part, affirmed the trial court's factual determination that Parks "was not driving the car with the permission of the insured owner." *See id.* at 1124. Thus, Parks was not covered under the employer's insurance policy and the insurer was therefore not liable for the damages caused by Parks. *See id.* Next, the Court held that because the duty to defend "only

runs to those insured under the policy" and because Parks was found not to be covered under the policy, the insurer was not obligated to defend Parks in the lawsuit initiated against him. *See id.* The Court did note, however, that "[i]t is undoubtedly true that where any substantial question as to coverage exists, it may involve some risk on the part of the insurance company to refuse to defend." *Id.* But because the trial court ultimately vindicated the insurer's decision not to defend Parks, the Court held the insurer did not have a duty to defend him and therefore the insurer could not have breached the duty. *See id.*

¶70   We do not read *McCarty* as contradicting our holding. In that case, Parks, who had been granted permission to take the vehicle on a two- or three-day trip to Flagstaff, did not have permission to drive to and remain in Salt Lake City for over two months. In that scenario, in which the vehicle was essentially stolen, there was no reasonable basis on which to conclude that Parks was insured under the employer's policy at the time of the accident. This stands in stark contrast to the present case in which a genuine issue existed as to whether Farmers Insurance properly cancelled the insurance policy, which issue was not resolved without some difficulty both in the trial court and on appeal.

¶71   Accordingly, we hold that Farmers Insurance had a duty to defend Jared until the court determined that the insurance policy had been properly cancelled. Because Farmers Insurance did not defend Jared in the underlying action, it breached the duty to defend.

B.   Damages for Breach of the Duty to Defend

¶72   Having concluded that Farmers Insurance breached its duty to defend, we next turn to the question of damages. Jared raises several challenges to the trial court's damages award for Farmers Insurance's breach of the duty to defend. We address each in turn.

1.     The 2009 Judgment

¶73    Jared argues that he is entitled, as a matter of law, to a judgment equal to the amount of the 2009 Judgment entered against him. In light of our Supreme Court's decision in *Summerhaze Co. v. Federal Deposit Insurance Corp.*, 2014 UT 28, 332 P.3d 908, we agree.[29]

¶74    In *Summerhaze*, our Supreme Court clarified that "if an insurer has notice of a claim against an insured, and has been afforded an opportunity to appear and defend, regardless of whether the insurer actually appears, *any judgment against the insured will also conclusively bind the insurer*." *Id.* ¶ 37 (emphasis added) (quotation otherwise simplified). *See id.* ¶ 38 ("An insurer

---

29. Farmers Insurance asserts that "[t]his argument appears to be unpreserved" and that we should therefore "decline to consider it." This is incorrect. Although Jared did not cite in his opening brief the record showing that this issue was preserved, in contravention of rule 24(a)(5)(B) of the Utah Rules of Appellate Procedure, he provided the requisite record citations in his reply brief. Jared's preservation of this issue is inarguable. He argued in a motion for summary judgment that "[b]ecause Farmers failed to defend, judgment should be entered against it in the amount of the judgment against" him. The trial court also explicitly rejected Jared's argument, stating that it "conflate[d] the duty to defend with the duty to indemnify." Although Jared did not cite our Supreme Court's opinion in *Summerhaze Co. v. Federal Deposit Insurance Corp.*, 2014 UT 28, 332 P.3d 908, in his motion—indeed, his motion predated the opinion by a matter of months—a party need only preserve an *issue*, and "new *arguments*, when brought under a properly preserved issue or theory, do not require an exception to preservation." *State v. Johnson*, 2017 UT 76, ¶ 14 n.2, 416 P.3d 443 (emphasis in original). This includes "citing new authority or cases supporting an issue that was properly preserved." *Id.*

that refuses a tender of defense by its insured takes the risk not only that it may eventually be forced to pay the insured's legal expenses but also that it may end up having to pay for a loss that it did not insure against.") (quotation simplified); *Speros v. Fricke*, 2004 UT 69, ¶ 52, 98 P.3d 28 ("As a general rule, when an insurer, whose policy requires it to defend its insured, receives notice of a suit against the insured and is allowed an opportunity to defend, but refuses, the insurer is bound by the findings and judgment therein.") (quotation simplified). The Court further stated that "an insurer may *challenge its liability for the judgment*, contest the amount of damages, or set forth any other available defense that the insured neglected to make" only if the insurer was not put on notice of the lawsuit through tender of defense.[30] *Summerhaze*,

---

30. The dissent disagrees with our interpretation of this statement, asserting that "[t]he quotation from *Summerhaze* states simply that an insurer who *does not* receive a tender of defense from an insured 'may challenge its liability for the judgment, contest the amount of damages, or set forth any other available defense that the insured neglected to make.'" *Infra* note 46. *See Summerhaze*, 2014 UT 28, ¶ 37 ("[W]ithout a tender of defense, an insurer may challenge its liability for the judgment, contest the amount of damages, or set forth any other available defense that the insured neglected to make."). The dissent further states that "[n]either this paragraph of *Summerhaze* nor any other ever states or holds that an insurer who breaches its duty to defend is foreclosed from raising coverage defenses in a second case." *Infra* note 46.

Although the dissent is correct that the quote in question does not expressly indicate that an insurer who receives notice of an action against an insured may not "challenge its liability for the judgment, contest the amount of damages, or set forth any other available defense that the insured neglected to make," *Summerhaze*, 2014 UT 28, ¶ 37, it naturally follows that if an insurer who did not receive notice may do so, then an insurer who did receive notice may not. Otherwise, such discussion on the

(continued…)

2014 UT 28, ¶ 37 (emphasis added). This is because, as previously discussed, an insurer's duty to defend is "broader than its duty to indemnify." *Id.* ¶ 36 (quotation simplified). Additionally, an insurer's duty to defend is a fiduciary duty. *See Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 799–800 (Utah 1985).

¶75 The Court further stated that an insurer that receives a tender of defense but believes it is not liable for coverage has two options of how to proceed without risking breach of the duty to defend: (1) it "may either protect its interests through a declaratory judgment proceeding asking the court to determine coverage under an insurance policy" or (2) "it may defend the suit under a reservation of its right to seek repayment later." *Summerhaze*, 2014 UT 28, ¶ 38 (quotation simplified). *See Farmers Ins. Exch. v. Call*, 712 P.2d 231, 237 (Utah 1985) ("When faced with a decision as to whether to defend or refuse to defend, an insurer is entitled to seek a declaratory judgment as to its obligations and rights."); *General Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1102 (Ill. 2005) ("Where the insurance carrier is uncertain over insurance coverage for the underlying claim, the proper course is for the insurance carrier to tender a defense and seek a declaratory judgment as to coverage under the

---

distinction regarding notice would have been wholly unnecessary. Indeed, the Court first stated that "[i]f an insurer has notice of a claim against an insured . . . any judgment against the insured will also *conclusively* bind the insurer," *id.* (emphasis added) (quotation otherwise simplified), which stands in contrast to its later statement of what the insurer may do in the opposite situation where the insurer did not receive notice. Our interpretation is further supported by the Court's later statement that "an insurer that refuses a tender of defense by its insured takes the risk not only that it may eventually be forced to pay the insured's legal expenses but also that it may end up having to pay for a loss that it did not insure against." *Id.* ¶ 38 (quotation simplified).

policy.") (quotation simplified). And as discussed above, an insurer who fails to take these steps "takes the risk not only that it may eventually be forced to pay the insured's legal expenses but also that *it may end up having to pay for a loss that it did not insure against.*" *Summerhaze*, 2014 UT 28, ¶ 38 (emphasis added) (quoting *Hamlin Inc. v. Hartford Accident & Indem. Co.*, 86 F.3d 93, 94 (7th Cir. 1996)).[31] This is because a breach of the duty to defend

---

31. The court in *Hamlin Inc. v. Hartford Accident & Indemnity Co.*, 86 F.3d 93 (7th Cir. 1996), explained that "[i]f the lack of a defender causes the insured to throw in the towel in the suit against it, the insurer may find itself obligated to pay the entire resulting judgment or settlement even if it can prove lack of coverage." *Id.* at 94. But the Nevada Supreme Court took a different approach. After quoting the same provision in *Hamlin* that our Supreme Court quoted in *Summerhaze*, the court stated, "However, we are not saying that an entire judgment is automatically a consequence of an insurer's breach of its duty to defend; rather, the insured is tasked with showing that the breach caused the excess judgment and is obligated to take all reasonable means to protect himself and mitigate his damages." *Century Surety Co. v. Andrew*, 432 P.3d 180, 186 (Nev. 2018) (quotation simplified). Thus, in Nevada, the insurer may be liable for the judgment only if the insurer's breach of the duty to defend caused the insured to be worse off and if the insured took mitigating actions—as opposed to merely throwing in the towel.

But our Supreme Court foreclosed either of these approaches when it stated that an insurer may challenge "its liability for the judgment, contest the amount of damages, or set forth any other available defense that the insured neglected to make" only if the insurer did not receive notice of the lawsuit. *Summerhaze*, 2014 UT 28, ¶ 37. *See also supra* note 30. This approach is more in line with other jurisdictions that have held that the insurer is required to pay the resulting judgment regardless of prejudice. *See, e.g., Consolidated Rail Corp. v. Liberty Mutual Ins. Co.*, 416 N.E.2d 758,

(continued…)

forecloses the insurer from challenging "its liability for the judgment."[32] *See id.* ¶ 37.

¶76 Here, as discussed in Part III.A above, Farmers Insurance had a duty to defend Jared against Farm Bureau's lawsuit until the trial court terminated the duty by ruling that Farmers Insurance had properly cancelled the insurance policy. The court entered the 2009 Judgment against Jared approximately four years prior to this requisite ruling. By not defending Jared until that point, Farmers Insurance violated the duty to defend. Accordingly, although it was later determined that no insurance policy was in effect at the time of the accident, because Farmers Insurance had notice of Farm Bureau's lawsuit against Jared, it

---

764 (Ill. App. Ct. 1981) ("[W]here potential coverage exists and an insurer unjustifiably refuses to defend, the insurer is contractually estopped from denying coverage. Prejudice is not a critical factor."); *Farmers Union Mutual Ins. Co. v. Staples*, 2004 MT 108, ¶ 29, 90 P.3d 381 (stating that an insurer that breached its duty to defend "was estopped from denying coverage and [the insured] was entitled to summary judgment").

32. In addition to the underlying judgment and attorney fees, an insurer who violates the duty to defend may also be liable for consequential "damages for injury to reputation or credit rating, [or] damages for emotional distress," *Campbell v. State Farm Mutual Auto. Ins. Co.*, 840 P.2d 130, 139 (Utah Ct. App. 1992), *cert. denied*, 853 P.2d 897 (Utah 1992), as well as for punitive damages under a claim for breach of fiduciary duty, *see id.*; *Norman v. Arnold*, 2002 UT 81, ¶ 35, 57 P.3d 997 ("In Utah, a claim for breach of fiduciary duty is an independent tort that, on occasion, arises from a contractual duty, and can serve as the basis for punitive damages."); *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 800 (Utah 1985) (stating that the duty to defend is a fiduciary duty and that breach of the duty "exposes insurers to consequential and punitive damages awards in excess of the policy limits").

could not "challenge its liability for the judgment, contest the amount of damages, or set forth any other available defense that the insured neglected to make." *See id.* We therefore reverse the trial court's damages award and remand with instructions to enter an order directing Farmers Insurance to satisfy the 2009 Judgment and additional interest on Jared's behalf.

¶77  The dissent engages in a thorough discussion of the two general categories of approaches other jurisdictions have taken in addressing the issue of damages for breach of the duty to defend: the "Illinois Rule" and the "majority rule." *See infra* ¶¶ 106–08. The approach we have interpreted *Summerhaze* to mandate is more akin to the Illinois Rule,[33] in that it precludes an insurer who breaches the duty to defend from raising coverage defenses or otherwise challenging the judgment entered against the party to whom it owed the duty. The dissent, however, asserts that "several Utah cases have, in [its] view, implicitly signaled an affinity for the majority rule," *infra* ¶ 109, under which "insurers who breach their duty to defend are not thereby estopped from raising coverage defenses later, and that the amount of damages an insured sustains from an insurer's breach of a duty to defend must, for the most part, be shown through traditional methods of proving damages for breach of contract," *infra* ¶ 105. The dissent further contends that, in its view, "the best reading of *Summerhaze* is that it does not indicate adoption of the Illinois Rule." *Infra* ¶ 124. Although this issue would greatly benefit from further clarification from our Supreme Court, we disagree with the dissent's conclusion that Utah case law favors the majority rule.

---

33. But as discussed in more detail below, because in Utah the duty to defend is a fiduciary duty, there are also significant potential differences between the rule interpreted in *Summerhaze* and the general Illinois Rule adopted by other jurisdictions—at least in terms of the means by which the rule is reached. *See infra* ¶¶ 78–80. *See also supra* note 31.

¶78 As an initial matter, the dissent discusses that the jurisdictions that have adopted the majority rule have leveled the following criticisms at the Illinois Rule: (1) if the duty to indemnify and the duty to defend "are truly separate and distinct, then an insurer's wrongful failure to defend should not result in a loss of an indemnity defense," *infra* ¶ 108 (quoting *Flannery v. Allstate Ins. Co.*, 49 F. Supp. 2d 1223, 1228 (D. Colo. 1999)); (2) the "punitive" nature of the Illinois Rule is "out of place in the contract law context," *infra* ¶ 108; and (3) estoppel, on which the Illinois Rule is largely based, "is conceptually not a good fit" because "in refusing to defend a claim, an insurer makes no misrepresentation [about coverage] on which the insured relies to its detriment," *infra* ¶ 108 (alteration in original) (quoting *Polaroid Corp. v. Travelers Indem. Co.*, 610 N.E.2d 912, 922 (Mass. 1993)).

¶79 Concerning the first criticism, although the duty to indemnify and the duty to defend are "two distinct duties," "an insurer's duty to defend [is] broader than its duty to indemnify." *Summerhaze*, 2014 UT 28, ¶ 36 (quotation simplified). Although this distinction has been discussed largely in terms of when the duty to defend is triggered, i.e., when the "complaint alleges any facts or claims that might fall within the ambit of the policy," *id.* (quotation simplified), the duty to defend is also broader in that the insurer may be held liable for "consequential and punitive damages awards in excess of the policy limits," *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 800 (Utah 1985). A reasonable inference would be that the duty to defend is broader than the duty to indemnify in that it covers not only judgments within policy limits, but also damages in excess of the policy limits.

¶80 Also, the second and third articulated concerns carry little weight in Utah. Although "an insurer's duty to defend arises solely under the terms of the contract," *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2011 UT 49, ¶ 8, 266 P.3d 733 (quotation simplified), our Supreme Court has elevated the duty to defend to a fiduciary one that "exposes insurers to

consequential and punitive damages awards in excess of the policy limits," *Beck*, 701 P.2d at 800. This is because "the contract itself creates a fiduciary relationship because of the trust and reliance placed in the insurer by its insured." *Id.* at 799. Namely, "the insurer controls the disposition of claims against its insured, who relinquishes any right to negotiate on his own behalf," and "[a]n insurer's failure to act in good faith exposes its insured to a judgment and personal liability in excess of the policy limits." *Id.* Additionally, "[w]holly apart from the contractual obligations undertaken by the parties," in the third-party context, "the insurer acts as an agent for the insured," and "the law imposes upon all agents a fiduciary obligation to their principals with respect to matters falling within the scope of their agency." *Id.* at 799–800. Finally, in Utah, the duty to defend is also a statutory requirement. *See* Utah Code Ann. § 31A-22-303(5) (LexisNexis Supp. 2022) ("A policy containing motor vehicle liability coverage imposes on the insurer the duty to defend, in good faith, any person insured under the policy against any claim or suit seeking damages which would be payable under the policy."). For these reasons, despite the contractual roots of the duty to defend, the "punitive" nature of our holding is not out of place, nor do we read *Summerhaze* as imposing an estoppel-based rule.

¶81　The dissent next discusses three Utah Supreme Court cases that, "in [its] view, implicitly signaled an affinity for the majority rule." *Infra* ¶¶ 109–20. But in our view, two of those cases, *Speros v. Fricke*, 2004 UT 69, 98 P.3d 28, and *Benjamin v. Amica Mutual Insurance Co.*, 2006 UT 37, 140 P.3d 1210, are of limited relevance to the question of whether an insurer who breached its duty to defend may raise coverage defenses to the underlying judgment. And although the third case on which the dissent relies, *McCarty v. Parks*, 564 P.2d 1122 (Utah 1977), is somewhat instructive, it is at odds with *Summerhaze*, which, as the more recent case, carries the day on this issue.

¶82    In discussing *Speros*,[34] the dissent found it "notable that the *Speros* Court spent nineteen paragraphs determining whether coverage existed *before* analyzing whether Nationwide had breached its duty to defend" because "[i]f the *Speros* court had intended to adopt the Illinois Rule, there would have been no need to discuss coverage." *Infra* ¶ 116 (citation omitted). But it was not necessary for the Court to consider adopting either rule in *Speros*.[35] After determining that coverage existed—which was the main point of contention in that case—the Court turned to the duty to defend only in the context of addressing the issue of whether "Nationwide is entitled to litigate anew the issue of Hiatt's liability for the accident," *Speros*, 2004 UT 69, ¶ 48, which was the subject of a default judgment, *see id.* ¶ 4. The Court ultimately determined that "[w]hen Nationwide chose not to defend Hiatt, it forfeited its opportunity to dispute the underlying facts of the accident." *Id.* ¶ 53. The issue of damages had already been resolved by the court's analysis on coverage and, given the limited duty-to-defend issue the Court was asked to resolve, there was no need for the Court to consider whether the breach of the duty to defend precluded Nationwide from raising coverage issues—to the contrary, the Court had already held that coverage existed, thereby foreclosing the need to address such an issue. Thus, because such an analysis was entirely unnecessary in *Speros*, we do not read anything into the Court's silence on the issue.

¶83    The dissent similarly notes that in *Benjamin* our Supreme Court first addressed the duty to defend before turning to the duty to indemnify. *Infra* ¶ 119. The dissent asserts that

---

34. Because the dissent provides a detailed summary of each relevant case, we do not do so here.

35. There is no indication in *Speros* that the judgment entered against Hiatt was in excess of the policy limits, thus triggering the need for further analysis under the duty to defend.

> if the Illinois Rule were in effect, or if the Utah
> Supreme Court intended to adopt or apply that rule,
> there would be no need to engage in any analysis
> with regard to whether Amica breached the duty to
> indemnify because, under the estoppel rule, once it
> was determined that Amica had breached its duty
> to defend, Amica would be estopped from
> contesting coverage.[36]

*Infra* ¶ 119. But the facts of that case readily provide for an alternative explanation for why the Court proceeded to determine whether Amica breached the duty to indemnify after it already held that Amica breached the duty to defend. The two coworkers filed *separate* suits against Benjamin, both alleging, among other things, negligent infliction of emotional distress. *See Benjamin*, 2006 UT 37, ¶ 2. The Court held that Amica breached the duty to defend only with regard to one of the coworker's suits. *See id.* ¶ 26. But "[b]ecause Amica never discontinued its defense in the [second] case," the Court held that Amica "did not breach its duty to defend in that case." *Id.* Accordingly, because there was no breach of the duty to defend in the second case, the Court was

---

36. The dissent also notes that "even the majority opinion in this case attends first to the question of whether the policy was properly canceled, before then turning to the question of whether Farmers Insurance breached its duty to defend," which the dissent asserts "is a majority rule process, at root." *Infra* note 45. But we initially undertook an analysis of whether the policy was properly cancelled because, if it turned out that it had not been, this much more difficult issue that has been the subject of disagreement among this panel would have been unnecessary. To be sure, after this legal question is more conclusively resolved, future cases in which an insurer is held to have breached the duty to defend might be more efficiently resolved by wholly omitting discussion of damages for the duty to indemnify. But this was not the case here.

already required to reach the issue of the duty to indemnify at least in reference to the second case. It therefore would have been more efficient to simply resolve the issue of damages for both cases based on the breach of the duty to indemnify. And in light of this alternative explanation for the Court's decision to address the duty to indemnify after it had already resolved the duty to defend issue, we likewise do not read too much into the Court's approach in *Benjamin* as concerns our resolution of the issue currently before us.

¶84    This leaves the third case on which the dissent relies, *McCarty*. In that case, our Supreme Court held that the "general rule" that "an insurer, whose policy requires it to defend its insured, receives notice of a suit against him and is allowed an opportunity to defend, but refuses, is bound by the findings and judgment therein" did not apply to findings not "necessary to determination of the controversy between the immediate parties." *McCarty*, 564 P.2d at 1123. Accordingly, because "the issue as to whether Mr. Parks was driving with the permission of the insured was not a material issue in the main case," the insurer was able to subsequently litigate and eventually prevail on that issue. *Id.* at 1123–24. In light of this, the dissent views "*McCarty* as quite strongly signaling affinity for the majority rule." *Infra* ¶ 112.

¶85    But as the dissent acknowledges, in holding that the insurer breached the duty to defend, the Court "did not engage in the traditional duty-to-defend analysis of comparing the plaintiff's complaint against the applicable policy provisions, and did not discuss whether the plaintiff's complaint alleged that Parks had permission to be driving the vehicle." *Infra* ¶ 111. Instead, it resolved the issue by relying on res judicata principles. *See McCarty*, 564 P.2d at 1123–24. This, in our view, insufficiently counters the mandates our Supreme Court later set forth in *Summerhaze*, namely, that "any judgment against the insured will also *conclusively* bind the insurer" that breaches the duty to defend, *Summerhaze*, 2014 UT 28, ¶ 37 (emphasis added)

(quotation otherwise simplified), or that "an insurer may challenge its liability for the judgment, contest the amount of damages, or set forth any other available defense that the insured neglected to make" only if the insurer was not put on notice of the lawsuit, *id. See id.* ¶ 38 ("An insurer that refuses a tender of defense by its insured takes the risk not only that it may eventually be forced to pay the insured's legal expenses but also that it may end up having to pay for a loss that it did not insure against.") (quotation simplified).

¶86 For these reasons, we disagree with the dissent's arguments, well-reasoned though they are. We also welcome definitive clarification on this issue from our Supreme Court.

2. Emotional Distress

¶87 An insurer who violates the duty to defend may also be liable for consequential "damages for injury to reputation or credit rating, [or] damages for emotional distress." *Campbell v. State Farm Mutual Auto. Ins. Co.*, 840 P.2d 130, 139 (Utah Ct. App. 1992), *cert. denied*, 853 P.2d 897 (Utah 1992). Here, the trial court revised its prior decision on emotional damages and reduced its award from $320,000 to $0 on the ground that Jared had not proven causation. Instead, the court stated that the evidence established that his emotional distress was caused by Farm Bureau's lawsuit, the 2009 Judgment entered against him, and the lack of insurance coverage—not by Farmers Insurance's breach of the duty to defend. The court also rejected Jared's argument that he suffered emotional distress because the outcome of the underlying litigation would have been different if Farmers Insurance had represented him, stating that this assertion contradicted the parties' prior stipulation that "[t]here is no evidence that a different outcome would have resulted had Farmers accepted [Jared's] tender of defense—the facts supporting [Jared's] fault and the amount needed to make [the deceased driver's] heirs whole would not have changed based on

Farmers' provision of a defense." Lastly, the court stated that Jared's "intermingling of the duty to defend issue with the issues of liability and coverage improperly leaves the fact-finder to speculate regarding which damages were actually caused by Farmers' breach of the duty to defend." Accordingly, quoting *Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, 424 P.3d 897, the trial court stated that because "testimony that [a breach of contract] *could* cause emotional damages is not enough to support a finding that [the breach] *did* cause emotional damages," *see id.* ¶ 43 (emphases in original), and because "an abundance of evidence as to breach of duty cannot make up for a deficiency of evidence as to causation" or "for a deficiency of evidence as to damages," *see id.* ¶ 44 (quotation simplified), Jared "failed to present evidence that gives rise to a reasonable probability that he suffered damages caused by Farmers' breach of the duty to defend." *See Murphy v. Whalen*, 2018 UT App 215, ¶ 7, 437 P.3d 619 ("To prove the fact of damages, the party must do more than merely give rise to speculation that damages in fact occurred and instead must provide evidence that gives rise to a reasonable probability that the party suffered damages.") (quotation simplified).

¶88 Jared argues that the trial court "erred by relying on the causation analysis in the breach of fiduciary duty claim in *Gregory & Swapp*" because it is distinguishable from the case at hand. In that case, the plaintiff sought emotional distress damages arising from her attorney's breach of fiduciary duty when he concealed from her that her personal injury lawsuit had been dismissed. *See* 2018 UT 36, ¶¶ 10, 40. Although a jury awarded the plaintiff a significant sum for emotional damages as a result of the breach, *see id.* ¶ 3, our Supreme Court reversed, stating that "the evidence provided at trial shows only that she suffered emotional distress due to [her attorney's] legal malpractice" that resulted in dismissal of her earlier lawsuit, *id.* ¶ 40, and "the jury had no evidence upon which to base its verdict that [the plaintiff]

suffered emotional distress damages as a result of [her attorney's] intentional concealment," *id.* ¶ 45.

¶89    Jared argues that *Gregory & Swapp* is distinguishable because "[t]he specific nature of the breach of fiduciary duty" in that case "was merely informational," and it therefore "caused no additional harm to the plaintiff's situation otherwise." Whereas here, Jared asserts, Farmers Insurance's breach of fiduciary duty "resulted in actual harm" because if Farmers Insurance had "defended Jared, and settled within policy limits when the opportunity was presented, he would not have endured the emotional distress of a seven-figure excess judgment against him." In essence, Jared argues that the court erred in rejecting his argument that his being held liable for an excess judgment caused emotional distress. But Jared does not address his stipulation below that "the facts supporting [Jared's] fault and the amount needed to make [the deceased driver's] heirs whole would not have changed based on Farmers' provision of a defense." Additionally, Jared has not challenged the court's finding of fact in its original order awarding him $320,000 in emotional damages that "[t]he outcome of the underlying action would not have changed had [Jared] been provided counsel by" Farmers Insurance. For this reason, Jared's argument distinguishing *Gregory & Swapp* necessarily fails.

¶90    Jared also contends that *Gregory & Swapp* distinguished *Beck v. Farmers Insurance Exchange*, 701 P.2d 795 (Utah 1985), which specifically discussed emotional damages in a first-party insurance context for breach of contract, *see Gregory & Swapp*, 2018 UT 36, ¶ 35 n.42. Jared asserts that "an insurance contract is different than an attorney/client retainer agreement, for purposes of seeking emotional distress damages upon breach of contract." We disagree.

¶91    In *Gregory & Swapp*, our Supreme Court stated that just like with insurance contracts, "an argument can be made that clients

retain attorneys in personal injury cases not only to obtain monetary compensation, but also to provide peace of mind, and therefore mental anguish is fairly contemplated in the contract." *Id. See also Beck*, 701 P.2d at 802 ("[I]t is axiomatic that insurance frequently is purchased not only to provide funds in case of loss, but to provide peace of mind for the insured or his beneficiaries."). The Court further quoted *Beck* (which discussed emotional distress damages for breach of contract in the first-party insurance context, *see Beck*, 701 P.2d at 801–02) for the proposition that, in any event, "the foreseeability of any such damages will always hinge upon the nature and language of the contract and the reasonable expectations of the parties," *Gregory & Swapp*, 2018 UT 36, ¶ 35 n.42 (quotation simplified), and that based on this, "the nature and language of the contract do not support emotional distress damages in this case." *Id.* The Court thus expressly applied *Beck* and did not distinguish it.

¶92　In any event, our Supreme Court's discussion of *Beck* occurred in the context of its holding that the plaintiff was not entitled to emotional distress damages, as a matter of law, under a *breach of contract* theory. *See id.* ¶ 36. The standard the trial court in this case relied on fell under our Supreme Court's discussion of *breach of fiduciary duty*, *see id.* ¶¶ 37, 43–44, under which umbrella, breach of the duty to defend also falls, *see Beck*, 701 P.2d at 799.

¶93　For these reasons, we affirm the trial court's later determination that Jared had not proven that he suffered emotional distress as a result of Farmers Insurance's failure to defend against Farm Bureau's lawsuit.[37]

---

37. Because we affirm the trial court's holding that Jared failed to prove that Farmers Insurance's breach of the duty to defend caused his emotional distress, we do not address his argument that the court "erred when it limited Jared's emotional distress

(continued…)

3.      Attorney Fees

¶94    "Attorney fees may be recoverable as consequential damages flowing from an insurer's breach of either the express or the implied terms of an insurance contract" as long as the fees "were reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 468 (Utah 1996). "Breach of a fiduciary obligation is a well-established exception to the American rule precluding attorney fees in tort cases generally." *Kealamakia, Inc. v. Kealamakia*, 2009 UT App 148, ¶ 7, 213 P.3d 13 (quotation simplified). Thus, when attorney fees are awarded as consequential damages—as opposed to pursuant to a statute or contract—the inquiry "is not whether the fee awards are reasonable, but whether they are foreseeable." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 93, 372 P.3d 629. "[I]t is this foreseeability requirement that justifies an award based solely on a contingency fee." *Id.* For attorney fees based on a contingency fee agreement to be foreseeable, the party seeking attorney fees must show (1) "that it was foreseeable that the insured party would incur attorney fees if the insurer breached" and (2) "that the specific contingency fee arrangement entered into by the insured party was foreseeable." *Id.* ¶ 94.

¶95    Jared challenges the trial court's denial of his request for attorney fees for Farmers Insurance's breach of the duty to defend. He argues that he "should be awarded 40% of the [2009 Judgment] against him," which figure reflects the contingency fee agreement he entered with his attorneys. In light of our holding that Jared is

---

damages to a period during which he was unrepresented by counsel." We likewise do not address his argument that the court erred in not awarding damages for impairment to his credit score because this issue was not preserved. *See State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443.

entitled to an award equal to the 2009 Judgment plus interest, we agree.

¶96     The trial court originally awarded Jared $128,000 in attorney fees as consequential damages, which represented 40% of the court's original emotional distress award that Jared would have owed his attorneys under the contingency fee agreement. In so doing, the court found that (1) "[i]t was foreseeable to Farmers that its refusal to defend would force [Jared] to obtain counsel" and (2) "[i]t was also foreseeable to Farmers that counsel would charge a contingent fee of 40% as a result of Farmers' breach of the duty to defend." The court later reversed this attorney fees award but did so only because it had reduced its emotional damages award to $0. Based on our holding that Jared is entitled to a judgment equal to the amount of the 2009 Judgment plus post-judgment interest, Jared is likewise entitled to an award of 40% of that judgment as attorney fees—which award the trial court has already determined to be foreseeable. We therefore remand to the trial court to enter an award of attorney fees in accordance with the contingency fee agreement.[38]

---

38. Based on this award of attorney fees, we do not consider Jared's arguments that he is entitled to recover the "market value" and "reasonable" value of his attorneys' services for the litigation he engaged in related to his liability for the accident and to the broader issues related to cancellation of the insurance policy. This also includes his contentions that the court erred in refusing to bifurcate the second bench trial to determine reasonable attorney fees separately and his assertion that the court erred in excluding his exhibits related to attorney fees. Jared does not address the basis, contractual or otherwise, for an award of attorney fees that is in addition to the contingency fees he contracted to pay his attorneys. Indeed, the above award of attorney fees represents direct compensation for his attorneys' efforts in establishing that

(continued…)

IV. Duty of Good Faith and Fair Dealing

¶97 Jared challenges the trial court's grant of Farmers Insurance's motion for partial summary judgment on Jared's breach of the duty of good faith and fair dealing claim. A third-party insurer has "a fiduciary responsibility to act in good faith and be zealous in protecting the interests of its insured as it would in looking after its own." *UMIA Ins., Inc. v. Saltz*, 2022 UT 21, ¶ 44, 515 P.3d 406 (quotation simplified). Several duties "are inherent in the duty to act in good faith," including the duties to "act promptly and reasonably in accepting or rejecting the insured's claim for coverage, defend the insured, diligently investigate the claims against the insured, fairly and reasonably evaluate the claims against the insured, and fairly and reasonably settle the claims against the insured." *Id.* ¶ 45 (quotation simplified).

¶98 The trial court granted Farmers Insurance's unopposed motion for partial summary judgment on the ground that the motion showed that Jared had "not identified facts supporting his bad faith claim," thereby shifting the burden to Jared "to show that genuinely disputed material facts barred the relief sought." *See Orvis v. Johnson*, 2008 UT 2, ¶ 18, 177 P.3d 600 ("A summary judgment movant, on an issue where the nonmoving party will bear the burden of proof at trial, may satisfy its burden on summary judgment by showing, . . . that there is no genuine issue of material fact. Upon such a showing . . . the burden then shifts to the nonmoving party, who may not rest upon the mere allegations or denials of the pleadings, but must set forth specific

---

Farmers Insurance breached the duty to defend because Jared was found liable in the accident-related litigation and was therefore not entitled to any award from which his attorneys could be compensated 40%. Accordingly, because he has not carried his burden of persuasion on this threshold issue, we do not consider the issues that stem therefrom.

facts showing that there is a genuine issue for trial.") (quotation simplified). The court ruled that by not opposing the motion, Jared failed to show that a genuine issue of material fact barred summary judgment.

¶99   Jared's argument on cross-appeal is limited to asserting that Farmers Insurance's motion "failed to identify facts supporting its purported investigation," and that "there was nothing in [Farmers Insurance's] memorandum which addressed whether its duty to defend was 'fairly debatable' by reference to the allegations contained in [Farm Bureau's] complaint." In other words, Jared argues that Farmers Insurance failed to meet its burden on summary judgment. But Jared does not address the court's reasoning in granting summary judgment, i.e., that the burden of showing a genuine issue of fact shifted to him and that *he* failed to meet this burden when he did not oppose the motion. Accordingly, because Jared does not address the ground on which the court based its ruling, we do not reach the merits of Jared's argument.[39] *See Salt Lake County v. Butler, Crockett & Walsh Dev. Corp.*, 2013 UT App 30, ¶ 28, 297 P.3d 38 (stating that appellate courts will not reverse a trial court's ruling where the appellant does not challenge all grounds on which the court's ruling rests).

### V. Award of Costs Related to the 2009 Judgment

¶100 Finally, Farmers Insurance argues that the trial court "erred when it allowed Farm Bureau to amend its judgment against Jared in 2019" under rule 54(d) of the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 54(d)(1) ("Unless a statute, these rules, or a court order provides otherwise, costs should be

---

39. Because we do not disturb the trial court's grant of summary judgment on this issue, we likewise do not address Jared's argument that the court subsequently erred in determining that the law of the case doctrine applied to its summary judgment ruling.

allowed to the prevailing party."). It contends that even if the 2009 Judgment had not expired—which we hold it had not, *see supra* Part I—the Judgment "could not be amended to add costs Farm Bureau incurred during the entire litigation." We agree.

¶101 The 2009 Judgment—which represented the arbitration award Farm Bureau obtained against Jared for causing the automobile accident, plus pre-judgment interest—provided that it "shall be augmented in the amount of reasonable costs and attorney fees expended in collecting said Judgment by execution or otherwise as shall be established by affidavit." Nine years later, in 2018, Farm Bureau moved to amend the 2009 Judgment to include $11,423.04 in costs that it incurred between 2005 and 2013. Most of the list consisted of costs that were unrelated to collection on the 2009 Judgment, including arbitration fees, deposition costs, subpoena costs, and transcript costs. The court initially denied Farm Bureau's motion, stating that it could "discern no costs or attorney fees detailed therein that were incurred in collecting the 2009 Judgment." But the court later awarded Farm Bureau the requested costs, stating that because the 2009 Judgment was not a final judgment, it could be "properly augmented to include the costs requested" by Farm Bureau, which the court concluded "were necessary and reasonable given the complexity of this litigation and are therefore recoverable in accordance with rule 54(d)(1)."

¶102 But the 2009 Judgment permitted subsequent augmentation for the limited purpose of adding an award for, with our emphasis, "reasonable costs and attorney fees *expended in collecting said Judgment* by execution or otherwise[.]"As an initial matter, the costs Farm Bureau claimed to have incurred between 2005 and March 2009, when the court first entered the 2009 Judgment, could not possibly have been related to "collecting said Judgment." And almost all the costs Farm Bureau incurred between March 2009 and 2013 appear to be related to Farm Bureau's subsequent litigation against Farmers Insurance

regarding whether the insurance policy was in effect at the time of the accident. Such litigation was ultimately resolved following the first bench trial, and, notably, Jared and Farm Bureau were allied at this point in seeking a judgment against Farmers Insurance. *See supra* note 8. It cannot be said that the subsequent litigation in this matter constituted efforts to collect the 2009 Judgment. And in any event, even if some of the requested costs were related to collection on the 2009 Judgment, because the 2009 Judgment did not become enforceable for nearly a decade after its entry, any actions taken in the interim to collect on the judgment would have been improper.

¶103 We accordingly reverse and remand with instructions for the trial court to strike the $11,423.04 award of costs from the 2009 Judgment.

CONCLUSION

¶104 The 2009 Judgment was not a final judgment under rule 54(a) of the Utah Rules of Civil Procedure and therefore the eight-year period under section 78B-5-202(1) of the Utah Code did not begin to run on entry of the judgment. Accordingly, none of the issues Farm Bureau and Jared raise on appeal are moot, and we have jurisdiction to address all issues raised. We affirm the trial court's ruling that the insurance policy on the 1992 Ford Explorer was cancelled prior to the fatal accident, the court's ruling on summary judgment that Farmers Insurance did not breach its duty of good faith and fair dealing but that it did breach its duty to defend, and the court's determination that Jared had not proven that Farmers Insurance's breach of the duty to defend was the cause of his emotional distress. We reverse and remand, however, with instructions that the trial court remove the award of $11,423.04 in costs from the 2009 Judgment, order Farmers Insurance to pay the 2009 Judgment and any related costs and interests on Jared's behalf, and enter an award of attorney fees equaling 40% of the aforementioned judgment in favor of Jared.

HARRIS, Judge (concurring in part and dissenting in part):

¶105   I concur without reservation in Parts I, II, IV, and V of the majority opinion. I also concur completely in Part III.A—concluding that Farmers Insurance breached its duty to defend Jared in the suit filed against him by Farm Bureau—and in Part III.B.2—affirming the trial court's determination that Jared had not proven that he sustained emotional distress as a result of Farmers Insurance's breach of its duty to defend. But I cannot join Parts III.B.1 and III.B.3 of the majority opinion, because I believe the best (but by no means the only possible) reading of Utah Supreme Court case law is that, in Utah, insurers who breach their duty to defend are not thereby estopped from raising coverage defenses later, and that the amount of damages an insured sustains from an insurer's breach of a duty to defend must, for the most part, be shown through traditional methods of proving damages for breach of contract.[40] In this case, I would affirm the trial court's determination that Jared failed to satisfy his burden of proving any such damages.

---

40. I am already on record, in a way, on this issue. As a district judge, in another case, I issued a lengthy memorandum decision on these very issues. *See Fleming v. State Auto Prop. & Cas. Ins. Co.*, No. 100500504 (Utah 3d Dist. Ct., Summit County, Nov. 14, 2014). Nothing in the briefing and argument associated with this case has persuaded me that my analysis in *Fleming* was incorrect or should be revisited. In fact, as noted below, federal judges—both at the district court level and on appeal—viewed the relevant issues in the *Fleming* cases largely the same way I did. *See Auto-Owners Ins. Co. v. Fleming*, 701 F. App'x 738, 740–41, 740 n.1 (10th Cir. 2017); *Auto-Owners Ins. Co. v. Timbersmith, Inc.*, No. 2:12-cv-00786, 2016 WL 3356800, at *3 (D. Utah June 15, 2016), *aff'd*, *Auto-Owners Ins. Co. v. Fleming*, 701 F. App'x 738 (10th Cir. 2017). My thoughts in this separate opinion therefore largely track my previous decision.

I

¶106   For years, courts across the country have wrestled with the exact issue presented here: what are, or should be, the consequences visited upon an insurer that breaches its duty to defend an insured. There is no consensus on the question. Courts in some states, most notably Illinois, have held that an insurer whose insured has been sued on a claim that the insurer believes is beyond the scope of the policy's coverage has three options: (1) seek a declaratory judgment relieving it of the obligation to defend; (2) defend the insured under a reservation of rights; or (3) do neither and risk a subsequent finding that it breached its duty to defend, "a finding that would require it to indemnify the insured for any liability the insured incurs in the underlying action." *See Roman Cath. Diocese of Springfield in Ill. v. Maryland Cas. Co.*, 139 F.3d 561, 565–66 (7th Cir. 1998) (applying Illinois law); *see also Solo Cup Co. v. Federal Ins. Co.*, 619 F.2d 1178, 1184 (7th Cir. 1980) (also applying Illinois law). These courts have emphasized that their rule is grounded in principles of estoppel: "[t]he estoppel that the insurer risks when it elects to do nothing is an estoppel to deny coverage if it turns out that the insurance company did have an obligation to defend and breached that obligation." *See Roman Cath. Diocese*, 139 F.3d at 566; *see also Sentinel Ins. Co. v. First Ins. Co. of Haw.*, 875 P.2d 894, 911 (Haw. 1994) (stating that several jurisdictions, including Illinois, "hold that an insurer in breach of its duty to defend is precluded from taking the position that the judgment or settlement did not involve a covered risk"). The courts following this so-called "Illinois Rule" emphasize that "[a]n insurer should be subjected to some legal consequence for breaching its duty to defend an insured," and that insurers ought to be incentivized to "appear on behalf of the policyholder in the underlying lawsuit." *See K2 Inv. Group, LLC v. American Guar. & Liab. Ins. Co.*, 6 N.E.3d 1117, 1121

(N.Y. 2014) (Graffeo, J., dissenting). The Illinois Rule has been adopted in about a dozen states, as set out in the margin.[41]

¶107 But the Illinois Rule is not followed in most of the jurisdictions to have considered the question.[42] The opposite

---

41. *See Underwriters at Lloyds v. Denali Seafoods, Inc.*, 927 F.2d 459, 462–65 (9th Cir. 1991) (applying Washington law); *St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.*, 919 F.2d 235, 240 (4th Cir. 1990) (applying North Carolina law); *Jones v. Southern Marine & Aviation Underwriters, Inc.*, 888 F.2d 358, 363 (5th Cir. 1989) (applying Mississippi law); *Columbus Life Ins. Co. v. Arch Ins. Co.*, No. 3:14-cv-01659, 2016 WL 2865952, at *12 (N.D. Ind. May 27, 2016) (applying Ohio law); *Sauer v. Home Indem. Co.*, 841 P.2d 176, 183 (Alaska 1992); *Missionaries of Co. of Mary, Inc. v. Aetna Cas. & Surety Co.*, 230 A.2d 21, 25–26 (Conn. 1967); *Farmers Union Mutual Ins. Co. v. Staples*, 2004 MT 108, ¶ 28, 90 P.3d 381; *IMO Indus. Inc. v. Transamerica Corp.*, 101 A.3d 1085, 1112–13 (N.J. Super. Ct. App. Div. 2014); *Dove v. State Farm Fire & Cas. Co.*, 399 P.3d 400, 406 (N.M. Ct. App. 2017); *Conanicut Marine Services, Inc. v. Insurance Co. of N. Am.*, 511 A.2d 967, 971 (R.I. 1986); *Marks v. Houston Cas. Co.*, 2016 WI 53, ¶ 72, 881 N.W.2d 309.

42. Although "obtaining an exact 'scorecard' of the states on this issue can be difficult because of the absence of definitive authority in many states," Jeffrey W. Stempel, *Enhancing the Socially Instrumental Role of Insurance: The Opportunity and Challenge Presented by the ALI Restatement Position on Breach of the Duty to Defend*, 5 U.C. Irvine L. Rev. 587, 595 (2015) [hereinafter Stempel], commentators agree that the majority of jurisdictions do not follow the Illinois Rule, *see id.* at 595–96; *see also* Douglas R. Richmond, *A Liability Insurer's Breach of the Duty to Defend and the Controversial Forfeiture of Coverage Defenses*, 47 Fla. St. U. L. Rev. 583, 596 (2020) [hereinafter Richmond]; Todd S. Weiss, *A Natural Law Approach to Remedies for the Liability Insurer's Breach of the Duty*

(continued…)

---

position—that insurers who breach their duty to defend are *not* estopped from later contesting the scope of coverage—has actually been adopted in more than twenty states and represents the prevailing majority rule.[43] At least two different judicial opinions, as well as various commentators, have canvassed the various cases. *See Flannery v. Allstate Ins. Co.*, 49 F. Supp. 2d 1223, 1227 (D. Colo. 1999); *Sentinel*, 875 P.2d at 911; *see also* 1 Allan D.

---

*to Defend: Is Estoppel of Coverage Defenses Just?*, 57 Alb. L. Rev. 145, 147 (1993) [hereinafter Weiss].

43. *See Scottsdale Ins. Co. v. Byrne*, 913 F.3d 221, 231 (1st Cir. 2019) (applying Massachusetts law); *Colonial Oil Indus., Inc. v. Underwriters Subscribing to Policy Nos. TO31504670 and TO31504671*, 133 F.3d 1404, 1405 (11th Cir. 1998) (applying Georgia law); *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485, 1493 (5th Cir. 1992) (applying Texas law); *Flannery v. Allstate Ins. Co.*, 49 F. Supp. 2d 1223, 1227 (D. Colo. 1999) (applying Colorado law); *Alabama Farm Bureau Mutual Cas. Ins. Co. v. Moore*, 349 So. 2d 1113, 1116 (Ala. 1977); *Quihuis v. State Farm Mutual Auto. Ins. Co.*, 334 P.3d 719, 727–29 (Ariz. 2014); *Sunseri v. Camperos Del Valle Stables, Inc.*, 185 Cal. App. 3d 559, 561–62 (1986); *Caldwell v. Allstate Ins. Co.*, 453 So. 2d 1187, 1190 (Fla. Dist. Ct. App. 1984); *Sentinel Ins. Co. v. First Ins. Co. of Haw.*, 875 P.2d 894, 911 (Haw. 1994); *Hirst v. St. Paul Fire & Marine Ins. Co.*, 683 P.2d 440, 447 (Idaho Ct. App. 1984); *Foreman v. Jongkind Bros.*, 625 N.E.2d 463, 469 (Ind. Ct. App. 1993); *Aselco, Inc. v. Hartford Ins. Group*, 21 P.3d 1011, 1020 (Kan. Ct. App. 2001); *Cincinnati Ins. Co. v. Vance*, 730 S.W.2d 521, 524 (Ky. 1987); *Arceneaux v. Amstar Corp.*, 66 So. 3d 438, 452 (La. 2011); *Elliot v. Hanover Ins. Co.*, 1998 ME 138, ¶ 7, 711 A.2d 1310; *Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990); *K2 Inv. Group, LLC v. American Guar. & Liab. Ins. Co.*, 6 N.E.3d 1117, 1120 (N.Y. 2014); *Sellie v. North Dakota Ins. Guar. Ass'n*, 494 N.W.2d 151, 155 (N.D. 1992); *Timberline Equip. Co. v. St. Paul Fire & Marine Ins. Co.*, 576 P.2d 1244, 1246 (Or. 1978); *American States Ins. Co. v. State Auto. Ins. Co.*, 721 A.2d 56, 64 (Pa. Super. Ct. 1998).

Windt, *Insurance Claims & Disputes: Representation of Insurance Companies & Insureds* § 4:37 (6th ed. 2023) (stating that "[t]he vast majority of cases have properly held that an insurer's unjustified refusal to defend does not estop it from later denying coverage under its duty to indemnify" and that "[t]he insurer's breach of contract should not . . . be used as a method of obtaining coverage for the insured that the insured did not purchase").

¶108 The courts following the majority rule have emphasized that "the duty to defend and the duty to indemnify are separate and distinct," and have reasoned that "if the two duties are truly separate and distinct, then an insurer's wrongful failure to defend should not result in a loss of an indemnity defense." *See Flannery*, 49 F. Supp. 2d at 1228 (quotation simplified); *see also Sentinel*, 875 P.2d at 912 ("[A] blanket application of coverage by waiver or estoppel, based upon the failure to provide a defense, subverts any meaningful distinction between the duty to defend and the separate duty to indemnify and, in many cases, serves no more than to punish the insurer for the breach of a contractual duty."). Indeed, these courts have been troubled by the "punitive" aspect of the estoppel rule, finding such a concept—at least in the absence of bad faith—out of place in the contract law context. *See Hirst v. St. Paul Fire & Marine Ins. Co.*, 683 P.2d 440, 447 (Idaho Ct. App. 1984) (stating that "[w]e question the propriety of utilizing a form of estoppel as a punitive measure against an insurer for breach of a contractual duty to defend"). They have also recognized that "estoppel" is conceptually not a good fit, stating that "no estoppel is involved in any traditional sense because, in refusing to defend a claim, an insurer makes no misrepresentation [about coverage] on which the insured relies to its detriment." *See Polaroid Corp. v. Travelers Indem. Co.*, 610 N.E.2d 912, 922 (Mass. 1993). Rather than estop the insurer from contesting coverage for the underlying judgment or settlement, the majority of courts allow an insurer—even one that breached its duty to defend an insured—to litigate coverage issues in a second case.

II

¶109 Utah appellate courts have never issued an opinion expressly stating whether Utah follows the majority rule or the Illinois Rule. But several Utah cases have, in my view, implicitly signaled an affinity for the majority rule. The situation is far from clear,[44] but as I explain in this section, my best reading of Utah case law is that our Supreme Court either has followed, or would follow if the question were squarely presented, the majority rule.

¶110 The first Utah case to discuss the issue is *McCarty v. Parks*, 564 P.2d 1122 (Utah 1977). In that case, Parks was employed by a car repair business in Arizona, and obtained permission from the business owner to use a vehicle owned by the business, after telling the business owner that he needed to make a short trip to a neighboring town and would be back in two or three days. *Id.* at 1123. After "borrowing" the vehicle, Parks proceeded to drive from Arizona to Salt Lake City, where he remained for over two months. *Id.* While in Utah he was involved in an automobile accident. *Id.* A third party was injured in the accident, and sued Parks in Utah. *Id.* The insurer that had issued a policy to the Arizona business owner was notified of the suit, but refused to provide Parks with a defense, claiming that Parks did not have the permission of the owner to be driving the vehicle and was therefore not covered under the policy, which covered only individuals driving the vehicle with permission. *Id.* at 1124. Because the insurer refused to defend Parks, a default judgment

44. This lack of clarity has led commentators to list Utah as falling on both sides of the debate. *Compare* Stempel, *supra* note 42, at 596 n.30 (including Utah with the states that follow the majority rule), *with* Richmond, *supra* note 42, at 603 n.116 (listing Utah among the states that follow the Illinois Rule). As already noted, and as discussed below, one federal appellate court construing Utah law considers Utah to follow the majority rule. *See Auto-Owners Ins. Co. v. Fleming*, 701 F. App'x 738, 740–41, 740 n.1 (10th Cir. 2017).

was entered against Parks, which judgment specifically included a finding that Parks "was driving [the vehicle] with permission of its owner." *Id.* at 1123. The question in *McCarty* was whether the insurer was bound by that particular finding of the court in the default judgment in the first case. *Id.* at 1123–24.

¶111 The Court in *McCarty* did not engage in the traditional duty-to-defend analysis of comparing the plaintiff's complaint against the applicable policy provisions, and did not discuss whether the plaintiff's complaint alleged that Parks had permission to be driving the vehicle. *Id.* Instead, the Court viewed the case through res judicata principles, and proceeded to analyze whether the insurer should be bound by the default judgment findings in the first case. *Id.* Ultimately, the Court determined that the insurer was *not* bound by that finding, despite the "general rule" that "an insurer[] whose policy requires it to defend its insured, receives notice of a suit against him and is allowed an opportunity to defend, but refuses, is bound by the findings and judgment therein." *Id.* at 1123. The Court determined that this "general rule" did not apply to findings not "necessary to determination of the controversy between the immediate parties." *Id.* Because resolution of the plaintiff's tort suit against Parks did not require determination of whether Parks had permission to be driving the vehicle, the insurer would not be bound by that extraneous finding, and would be "afforded an opportunity to raise and have determined the issue as to its own liability, so long as doing so is not inconsistent with the findings on material issues which were determined" in the first case between the plaintiff and Parks. *Id.* In the end, after considering the issue anew, the trial court in *McCarty* determined that—despite the extraneous finding in the default judgment—Parks did *not* have permission to be driving the vehicle, and was therefore not covered by the policy, and this decision was affirmed on appeal. *Id.* at 1123–24.

¶112 Thus, in *McCarty*, an insurer was allowed to contest coverage issues in a second case, even after refusing to defend a

potential insured, and even after the court in the first case, in the context of a default judgment, had made a finding (albeit an extraneous one) that compelled coverage. *See id.* In the course of reaching its decision, the *McCarty* Court cited approvingly to a California case, *see id.* at 1123 n.3 (citing *Geddes & Smith, Inc. v. St. Paul-Mercury Indem. Co.*, 334 P.2d 881 (Cal. 1959)), that espouses "majority rule" principles, *see Sentinel*, 875 P.2d at 910 (citing *Geddes & Smith* as a majority rule case). Thus, even though the court in *McCarty* did not expressly state that it was following the majority rule, I view *McCarty* as quite strongly signaling affinity for the majority rule.

¶113   Our Supreme Court again discussed these issues in *Speros v. Fricke*, 2004 UT 69, 98 P.3d 28. In that case, Fricke was driving a passenger, named Hiatt, home from a nightclub on New Year's. *Id.* ¶ 2. Hiatt was in the front passenger seat. *Id.* On the way home, "Hiatt suddenly and without warning reached over and grabbed the [vehicle's] steering wheel," causing the vehicle to veer into oncoming traffic and to collide with Speros's vehicle. *Id.* Fricke was insured by Nationwide Insurance Company, and Speros was insured by West American Insurance Company. *Id.* ¶¶ 2–3. West American compensated Speros for his injuries, and demanded reimbursement from Nationwide, asserting that the accident was not Speros's fault. *Id.* ¶ 3. Nationwide looked at the case and determined that Fricke was not negligent, and that the Nationwide policy covering Fricke did not cover Hiatt under the circumstances. *Id.* Based on this conclusion, Nationwide refused to reimburse West American, and West American then filed suit against Hiatt, Fricke, and Nationwide. *Id.* In that suit, Nationwide defended the claims alleged against itself and against Fricke, but refused to defend Hiatt and, as a result, West American obtained a default judgment against Hiatt. *Id.* ¶ 4.

¶114   On appeal, our Supreme Court first tackled the issue of whether Nationwide's policy with Fricke covered Hiatt. *Id.* ¶¶ 31–40. First, the Court discussed whether there was coverage for

Hiatt under the policy and, after a lengthy analysis, determined that "[b]ecause Hiatt had permission to ride in Fricke's car as a passenger, . . . he was covered as a 'permissive user' under Fricke's policy with Nationwide for the duration of the ride" and that "Hiatt's actions in grabbing and turning the steering wheel did not disqualify him from permissive user status." *Id.* ¶ 40. Next, the Court took up the issue of whether the "intentional acts" exclusion in the policy applied to the facts of the case. *Id.* ¶¶ 41– 47. After a lengthy discussion that included consideration of statutes and public policy, the Court held that "the intentional acts exclusion is unenforceable against accident victims up to the minimum liability limits prescribed by the statute." *Id.* ¶ 44. Accordingly, the Court determined that coverage existed under the Nationwide policy for the actions committed by Hiatt, at least up to the statutory minimum limits. *Id.* ¶ 47.

¶115 Only after concluding that coverage existed for Hiatt did the Court then turn to whether Nationwide breached its duty to defend Hiatt. *See id.* ¶¶ 48–53. Unlike in *McCarty*, the Court in *Speros did* engage in a traditional duty-to-defend analysis, and ultimately determined that "[t]he complaint filed by Speros and West American imposed a duty on Nationwide to defend Hiatt," because that complaint alleged that Hiatt's negligent acts caused the accident and alleged that Hiatt was an insured person under the Nationwide policy with Fricke. *Id.* ¶¶ 50–51. The Court held that when Nationwide exposed Hiatt to the risk of a default judgment "in breach of its duty to defend, it also exposed itself to the risk that it could lose the ability to litigate the facts giving rise to Hiatt's alleged liability and that it could thereafter be held liable for the resulting judgment." *Id.* ¶ 51. "When Nationwide chose not to defend Hiatt, it forfeited its opportunity to dispute the underlying facts of the accident." *Id.* ¶ 53.

¶116 In my view, it is notable that the *Speros* Court spent nineteen paragraphs determining whether coverage existed, *see id.* ¶¶ 29–47, *before* analyzing whether Nationwide had breached

its duty to defend. If the *Speros* Court had intended to adopt the Illinois Rule, there would have been no need to discuss coverage, because the conclusion that the duty to defend had been breached—an analysis that depends on the allegations in the complaint, not on the actual facts—would have automatically resulted in coverage under that estoppel-based rule.[45] Second, when viewed in tandem with *McCarty*, the Court's statement in *Speros* that an insurer "forfeit[s] its opportunity to dispute the underlying facts of the accident," *see id.* ¶ 53, can only be a reference to facts vital to the determination of negligence and related issues, *see McCarty*, 564 P.2d at 1123 (stating that an insurer is "bound by the findings and judgment" in an underlying case that it elects not to defend, but not with regard "to matters collateral or immaterial to the essential issues involved in the case"); *see also Speros*, 2004 UT 69, ¶ 52 (citing and quoting *McCarty*). The fact that the Court did not automatically apply estoppel upon determining that a duty to defend had been breached leads me to conclude that *Speros* did not apply the Illinois Rule, and that its reference to an insurer being bound was only meant to re-state the conclusions of *McCarty*. In other words, I read *Speros* as concluding that a breaching insurer's loss of "the ability to litigate the facts giving rise to [the putative insured's] alleged liability" in the underlying case, *see Speros*, 2004 UT 69, ¶ 51, does not include the loss of the ability to litigate coverage issues not decided in, or not necessary to the result of, the first

---

45. Indeed, even the majority opinion in this case attends first to the question of whether the policy was properly cancelled, before then turning to the question of whether Farmers Insurance breached its duty to defend. This is a majority rule process, at root; after all, if the consequence of Farmers Insurance's breach of its duty to defend is that it is estopped from contesting coverage, then we need not have spent some ten pages exploring the propriety of Farmers Insurance's cancellation. *See supra* ¶¶ 43–60.

case. I therefore interpret *Speros*, on balance, as a case following the tenets of the majority rule.

¶117   The next case to discuss these issues arose only two years after *Speros*, and in my view provides the clearest guidance of any of the Utah cases. In *Benjamin v. Amica Mutual Insurance Company*, 2006 UT 37, 140 P.3d 1210, two female co-workers of Benjamin asserted that Benjamin had sexually assaulted them. *Id.* ¶ 2. Accordingly, they filed two separate suits against Benjamin, stating both intentional tort claims (e.g., assault, battery, intentional infliction of emotional distress) as well as negligent tort claims (e.g., negligent infliction of emotional distress). *Id.* Benjamin tendered defense of the suits to his insurer, Amica, who had issued him a homeowners policy. *Id.* ¶ 5. Amica initially defended Benjamin, subject to a reservation of rights, in both cases, but later discontinued its defense in one of them after questioning Benjamin under oath about the allegations. *Id.* ¶ 6. The policy did not apply to injury "which is expected or intended by the insured," and Amica believed that this exclusion precluded coverage for Benjamin for the claims asserted. *Id.* ¶ 17 (quotation simplified). The "undefended" case proceeded to trial, without Amica assisting in the defense, and the jury found Benjamin liable *only* on the claim for negligent infliction of emotional distress, and found for Benjamin on the intentional tort claims. *Id.* ¶ 7. After trial in the first suit, Benjamin entered into settlement negotiations with both plaintiffs in both suits simultaneously. *Id.* ¶ 8. Benjamin notified Amica of the negotiations and asked Amica to participate, but Amica refused. *Id.* Thereafter, Benjamin settled both cases and asked Amica to indemnify him for the entire amount of the settlements, and Amica refused. *Id.*

¶118   Benjamin then filed suit against Amica, accusing Amica of breaching both the duty to defend and the duty to indemnify, and alleging that Amica acted in bad faith. *Id.* ¶ 9. The trial court ruled in favor of Benjamin and found that Amica had breached both duties. *Id.* ¶ 10. Amica appealed. *Id.* ¶ 11. This time, unlike in

*Speros*, the Utah Supreme Court tackled the issues in the more logical order: it first analyzed whether Amica had breached its duty to defend Benjamin, and then turned to whether coverage existed. On the first point, the Court compared the allegations of the complaint with the provisions of the policy, and determined that the policy covered negligent torts, and that the complaint alleged at least one such tort (negligent infliction of emotional distress). The Court stated that "Amica had a duty to defend Benjamin until it could establish that [the negligence] claims were not supported by the facts," and that "[b]ecause Amica owed a duty to defend the negligent infliction of emotional distress claims, Amica owed a duty to defend *all* of the claims." *Id.* ¶¶ 22, 25; *see id.* ¶ 25 ("When there are covered and non-covered claims in the same lawsuit, the insurer is obligated to provide a defense to the entire suit, at least until it can limit the suit to those claims outside of the policy coverage" (quotation simplified)).

¶119 After determining that Amica had breached its duty to defend Benjamin, the Court then turned to the question of whether Amica had breached its duty to indemnify. *See id.* ¶¶ 27–30. It is worth noting, here, that if the Illinois Rule were in effect, or if the Utah Supreme Court intended to adopt or apply that rule, there would be no need to engage in any analysis with regard to whether Amica breached the duty to indemnify because, under the estoppel rule, once it was determined that Amica had breached its duty to defend, Amica would be estopped from contesting coverage. But this is not what the Court did. The Court examined the language of the applicable policy in an effort to determine whether coverage existed for the claims Amica had refused to defend. *Id.* In the end, the Court determined that "the duty to indemnify is tied to the existence of covered claims," and "for the same reasons that Amica was obligated to defend against the claims for negligent infliction of emotional distress, it was also obligated to pay for the covered damages arising from those claims for which Benjamin was legally liable," *id.* ¶ 28 (quotation simplified), an amount the Court determined to be the "amount

[Benjamin] paid to settle the negligent infliction of emotional distress claims," *id.* ¶ 30 (quotation simplified).

¶120 The Court also determined that Amica was not allowed to second-guess Benjamin's decision to settle with the plaintiffs or the overall settlement amount, given that Amica had been offered the opportunity to "participate in and control" those settlement talks and had refused. *Id.* ¶ 29. However, the Court recognized that the settlement amount may well have included payments for both covered (negligent) and uncovered (intentional) claims, but noted that it did not have sufficient information before it to "determine what amount, if any, Benjamin paid to settle" the negligence claims, and "instruct[ed] the district court to hold a factual hearing to determine that amount." *Id.* ¶ 30. In my view, this procedure is emphatically a "majority rule" procedure, and not an "Illinois Rule" procedure.

¶121 And that brings me to *Summerhaze Co. v. Federal Deposit Insurance Corp.*, 2014 UT 28, 332 P.3d 908, the case principally relied upon by the majority opinion in this case. *See supra* ¶¶ 73–75 & 74 n.30.[46] In *Summerhaze*, an employee of a bank embezzled

_____

46. The majority relies heavily on its application of a statement from *Summerhaze*: "'[A]n insurer may challenge its liability for the judgment, contest the amount of damages, or set forth any other available defense that the insured neglected to make' only if the insurer was not put on notice of the lawsuit." *See supra* ¶ 74 (emphasis omitted) (quoting *Summerhaze Co. v. FDIC*, 2014 UT 28, ¶ 37, 332 P.3d 908). In my view, the majority overreads *Summerhaze*. The quotation from *Summerhaze* states simply that an insurer who *does not* receive a tender of defense from an insured "may challenge its liability for the judgment, contest the amount of damages, or set forth any other available defense that the insured neglected to make." *See Summerhaze*, 2018 UT 28, ¶ 37. Indeed, the majority acknowledges that *Summerhaze* was not

(continued…)

funds from the bank, and various creditors and affiliates of the bank filed suit against the bank alleging that it had improperly accepted unauthorized signatures and that it had acted negligently. *Id.* ¶ 2. The bank tendered the defense of the claim to its insurer, BancInsure. *Id.* ¶ 3. The bank also filed a declaratory judgment action against BancInsure seeking to establish that coverage existed for the claims brought by the plaintiffs, but that action was placed on a stipulated hold pending the outcome of the first suit brought by the plaintiffs. *Id.* ¶ 4.

¶122 Just a few months later, however, the bank was shut down by regulators, and the Federal Deposit Insurance Corporation (the FDIC) was appointed as the bank's receiver. *Id.* ¶ 5. All of the bank's creditors, including the plaintiffs, received notice of the receivership and were instructed that any claims against the bank needed to be submitted by proof of claim to the FDIC by a certain date pursuant to federal law. *Id.* The plaintiffs, apparently

---

presented with the question of whether an insurer would have any such rights if it *had* received notice of the lawsuit. *See supra* note 30. But in the majority's view, "it naturally follows that if an insurer who did not receive notice may do so, then an insurer who did receive notice may not." *Id.* In my view, however, no such thing "naturally follows"; indeed, the majority of courts to have taken up the question as to whether any such thing "naturally follows" have concluded that it does not. And *Summerhaze* did not purport to be taking up the relevant question. *See Auto-Owners Ins. Co. v. Fleming*, 701 F. App'x 738, 741 & n.1 (10th Cir. 2017) (referring to *Summerhaze*'s discussion of these issues as "dicta" that "was not necessary to the ultimate resolution of the case"). Neither this paragraph of *Summerhaze* nor any other ever states or holds that an insurer who breaches its duty to defend is foreclosed from raising coverage defenses in a second case, and *Summerhaze* certainly does not expressly adopt the Illinois Rule. For the reasons discussed, in my view the majority is reading far too much into *Summerhaze*.

believing that their pending lawsuit sufficed as "notice," did not file a proof of claim with the FDIC within the time prescribed. *Id.* ¶ 6. The FDIC then filed a motion to dismiss the plaintiffs' lawsuit on the ground that the state district court lacked subject matter jurisdiction over the case due to the plaintiffs' failure to timely send a proof of claim pursuant to federal law. *Id.* ¶ 7. The trial court granted the FDIC's motion, and the plaintiffs appealed. *Id.*

¶123 At issue on appeal, among other things, was whether the bank's tender of defense of the lawsuit to BancInsure had deprived the FDIC of authority to resolve the claims, thus excusing the plaintiffs from any obligation they might otherwise have had to file a timely proof of claim. *Id.* ¶ 35. The Utah Supreme Court noted that the bank had tendered the defense of the claim to BancInsure, but held that

> [t]he tender of defense did not affect the rights of the [b]ank or the FDIC, nor did it change the real party in interest. The tender of defense merely triggered the duty of defense under the Bond. The [b]ank and the FDIC were still actively involved in the defense of the claims. Therefore, the [b]ank and the FDIC retained authority to resolve the claims.

*Id.* ¶ 39. Accordingly, the Court ruled that the bank's tender of defense did not excuse the plaintiffs' failure to comply with the federal proof-of-claim requirement. *Id.*

¶124 Nothing in the *Summerhaze* Court's discussion of this topic has, in substance, anything to do with whether the Illinois Rule or the majority rule applies in Utah. However, in discussing the bank's tender of defense of the claims to BancInsure, the Court included some citations to certain Seventh Circuit cases that apply the Illinois Rule. *See id.* ¶¶ 36, 38 & nn.82, 91 (citing *Solo Cup Co. v. Federal Ins. Co.*, 619 F.2d 1178, 1183 (7th Cir. 1980)). One quotation in particular, at least at first glance, might seem to indicate allegiance to the Illinois Rule: "An insurer 'that refuses a

tender of defense by its insured takes the risk not only that it may eventually be forced to pay the insured's legal expenses but also that it may end up having to pay for a loss that it did not insure against.'" *Id.* ¶ 38 & n.92 (quoting *Hamlin Inc. v. Hartford Accident & Indem. Co.*, 86 F.3d 93, 94 (7th Cir. 1996)). In my view, however, the best reading of *Summerhaze* is that it does not indicate adoption of the Illinois Rule. This is so for several reasons.

¶125  First, the *Hamlin* case quoted in *Summerhaze* is a case out of Wisconsin, not out of Illinois, and in that case Judge Posner, writing for the Seventh Circuit, articulated his view that Wisconsin, at least conceptually and at least at the time, followed the majority rule, not the Illinois Rule. *See Hamlin*, 86 F.3d at 94–95 (citing Wisconsin law to the effect that "the insured must show that he was made worse off by the breach [of the duty to defend] than he would have been had the breach not occurred," noting that this rule was "the majority view," and that this rule was "inconsistent with a rule of *always* forbidding the insurer that has wrongfully refused to defend the insured's case to deny coverage").[47] Second, the discussion in *Summerhaze* is by no means one-sided; at one point the Court stated that "an insurer's duty to defend [is] broader than its duty to indemnify," and "the duty to indemnify is determined by the underlying facts of the case, while the duty to defend is controlled by the allegations in the complaint against the insured." 2014 UT 28, ¶ 36 (quotation simplified). Third, the *Summerhaze* Court did not even cite, let alone discuss, our Supreme Court's decisions in *McCarty*, *Speros*, and *Benjamin*. If the Court had intended to announce that it was adopting the Illinois Rule, it would have needed to distinguish, if not outright

---

47. A Wisconsin case decided since *Hamlin* sheds some doubt on Judge Posner's interpretation of Wisconsin law. *See Radke v. Fireman's Fund Ins. Co.*, 577 N.W.2d 366, 369–70 (Wis. Ct. App. 1998), *overruled on other grounds by Marks*, 2016 WI 53. And in any event, it is now clear that Wisconsin follows the Illinois Rule. *See Marks*, 2016 WI 53, ¶ 72.

overrule, that precedent, and it did not do so. Fourth and finally, whether the "estoppel rule" applies in Utah to an insurer that breached its duty to defend was not at all relevant to the issue presented in *Summerhaze*. Thus, even to the extent that *Summerhaze*'s citations to Seventh Circuit cases could be construed as tacit endorsement of the Illinois Rule, such an endorsement would necessarily be dicta.

¶126　Indeed, the United States Court of Appeals for the Tenth Circuit agrees with my reading of *Summerhaze*. *See Auto-Owners Ins. Co. v. Fleming*, 701 F. App'x 738 (10th Cir. 2017). In that case, the Tenth Circuit was required to analyze Utah case law—just as we are here—and to determine whether, under Utah law, insurers who breached their duty to defend were thereby estopped from raising coverage defenses. *See id.* at 740. The court examined the same Utah cases I examine here, and concluded that the discussion, in *Summerhaze*, regarding "estoppel and an insurer's duty to defend . . . was only intended to provide context to the jurisdictional analysis and was not necessary to the ultimate resolution of the case," and opined that "[s]uch dicta should not be taken to overrule the express holdings of *McCarty* and *Speros*, which were not cited" in *Summerhaze*. *Id.* at 741 & n.1. Applying this interpretation of Utah law, the court affirmed a federal district court's similar ruling and held that the insurance companies were not "estopped from challenging coverage" merely because they had breached their duty to defend an insured. *Id.* at 741.

¶127　In the end, after examination of all of this Utah case law, I think we find ourselves in a position similar to the position in which the Kansas Court of Appeals found itself in *Aselco, Inc. v. Hartford Insurance Group*, 21 P.3d 1011 (Kan. Ct. App. 2001). There, the court was faced with the decision whether to adopt the Illinois Rule, and canvassed Kansas law on the topic in an effort to determine whether the Kansas Supreme Court followed the majority rule. *Id.* at 1019–21. It noted that a Kansas federal court had already examined the issue, and had stated that

> Kansas courts have addressed situations in which
> [the Illinois Rule] could have been applied if the
> courts were so inclined but have not done so. In
> *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*,
> 512 P.2d 403 (Kan. 1973), the insurer breached its
> duty to defend the insured but the Kansas Supreme
> Court dealt with the merits of the insurer's policy
> defenses anyway. A similar situation was present in
> *Snodgrass v. State Farm Mutual Auto. Ins.*, 804 P.2d
> 1012 (Kan. 1991), in which a jury determined that
> State Farm had breached its duty to defend but on
> appeal, the appellate court considered State Farm's
> policy defenses concerning coverage. In either of
> these cases, had they chosen to do so, the court
> could have estopped the insurer from asserting its
> policy defenses after finding that it breached it[s]
> duty to defend.

*See id.* at 1020 (quoting *Johnson v. Studyvin*, 828 F. Supp. 877, 886–87 (D. Kan. 1993)) (quotation simplified). The court also noted another Kansas Supreme Court case in which the court, "[d]espite the insurer's earlier refusal to provide a defense," nevertheless "considered the insurer's policy arguments and held that coverage was excluded." *See id.* (referring to *Patrons Mutual Ins. Ass'n v. Harmon*, 732 P.2d 741 (Kan. 1987)). In the end, the court felt that the Kansas Supreme Court's "actions . . . speak louder than its words," and determined that "[b]ecause Kansas courts have been presented with situations in which they could have estopped insurers who have breached their duties to defend from denying coverage and have not done so, this court will not find that Kansas courts would so hold." *Id.* (quoting *Johnson*, 828 F. Supp. at 887); *see also id.* ("[W]e believe the cases decided to this point mean our Kansas Supreme Court would not adopt a bright line rule that insurers who fail to provide a defense and reserve their rights are inevitably equitably estopped from raising their coverage defenses.").

¶128  So too here. Although the Utah Supreme Court has never expressly stated that it has adopted the majority rule (as opposed to the Illinois Rule), its actions "speak louder than its words." *Id.* In *McCarty*, *Speros*, and (especially) *Benjamin*, the Utah Supreme Court has allowed insurers who refused to defend their insureds to later raise coverage defenses. This was allowed in *Speros* and *Benjamin* despite express determinations in both of those cases that the insurer had indeed breached its duty to defend the insured. Because the Utah Supreme Court has, three times, been "presented with situations in which it could have estopped insurers who have breached their duties to defend from denying coverage and [has] not done so," I cannot—in the absence of something more clearly so indicating—conclude "that the [Utah Supreme Court] would so hold."[48] *Cf. id.*

---

48. The propriety of adopting the Illinois Rule (over the majority rule) is one that turns on, among other things, one's sense of policy and related factors. Commentators have provided cogent arguments on both sides of the question. *Compare* Richmond, *supra* note 42, at 614, *and* Weiss, *supra* note 42, at 149, *with* Stanley C. Nardoni, *Estoppel for Insurers Who Breach Their Duty to Defend: Answering the Critics*, 50 J. Marshall L. Rev. 53 (2016), *and* Stempel, *supra* note 42, at 614–15. Even the authors of the Restatement of Liability Insurance have gone back and forth on the question. In 2014, the drafters decided to align the Restatement with the Illinois Rule, *see* Restatement of Liab. Ins. § 21 (Am. L. Inst., Tentative Draft No. 2, 2014), taking the position that an insurer that breaches the duty to defend loses "the right to contest coverage for the claim." *See id.* § 19(1) (Am. L. Inst., Discussion Draft, 2015). In a subsequent draft, however, the drafters sought a middle ground and suggested an estoppel rule that would apply only to an insurer who breaches "the duty to defend without a reasonable basis for its conduct." *See id.* § 19(2) (Am. L. Inst., Tentative Draft No. 1, 2016). But in 2019, the drafters rejected the

(continued…)

¶129   Thus, my best reading of Utah Supreme Court precedent—a reading aligned with the Tenth Circuit's—leads me to conclude that Utah does not follow the Illinois Rule, and that under the prevailing majority rule, Farmers Insurance would not be estopped, merely by virtue of its breach of its duty to defend Jared, from raising coverage defenses later.

III

¶130   The fact that an insurer that breaches its duty to defend remains free to raise coverage defenses later does not necessarily mean that the insurer gets off scot-free from its breach of duty. In most cases, there remain consequences for an insurer that breaches its duty to defend, even if those consequences do not include complete estoppel of coverage defenses.

¶131   First of all, as *McCarty* and *Speros* clearly indicate, an insurer may not contest the *amount* of any judgment rendered

Illinois Rule altogether and adopted the majority rule. *See id.* § 19 (Am. L. Inst. 2019) (adopting "the prevailing legal rule" that an "insurer that breaches the duty to defend" may still contest coverage but also "forfeits the right to assert any control over the defense or settlement of the action"); *see also* Richmond, *supra* note 42, at 591–92 (noting that, in 2019, the Restatement drafters "ultimately rejected the forfeiture-of-coverage-defenses rule . . . in favor of the majority rule, meaning that an insurer that mistakenly breaches the duty to defend retains the right to contest coverage"). Were we operating on a blank slate in Utah, I may have something to say in this context about which rule I think is the better one. But as set forth in this section, I do not think we are operating on a blank slate, and I view the Utah Supreme Court as having implicitly signaled its affinity for the majority rule. At any rate, this case may present a good opportunity for the Utah Supreme Court to clarify its intentions and, in that setting, perhaps examine which rule is the better one from a policy standpoint.

against an insured in a lawsuit it refused to defend, nor may it contest any findings or conclusions rendered by the trial court in the undefended case that are necessary to the result there reached. *See Speros*, 2004 UT 69, ¶¶ 51, 53 (clarifying that, when an insurer breaches its duty to defend, it "expose[s] itself to the risk that it could lose the ability to litigate the facts giving rise to [the insured's] alleged liability," and stating that "[w]hen [an insurer] chose not to defend [a putative insured], it forfeited its opportunity to dispute the underlying facts of the accident"); *McCarty*, 564 P.2d at 1123 (noting the "general rule" that an insurer that breaches its duty to defend "is bound by the findings and judgment" in the underlying case, but that this general rule does not apply to findings and conclusions not "necessary to determination of the controversy between the immediate parties"). And in my view, the inability of an insurer to contest the amount of the underlying judgment or conclusions necessary to it was exactly what the *Summerhaze* Court was referring to when it warned that "an insurer that refuses a tender of defense by its insured takes the risk not only that it may eventually be forced to pay the insured's legal expenses but also that it may end up having to pay for a loss that it did not insure against." *See Summerhaze*, 2014 UT 28, ¶ 38 (quotation simplified). As applied here, Farmers Insurance is prohibited from contesting the amount of the judgment Farm Bureau obtained against Jared, as well as any findings or conclusions that were necessary to the court's judgment in that case. But under the majority rule, it is barred from raising coverage defenses only to the extent that those defenses are impaired by one or more of the findings or conclusions that were necessary to the underlying judgment. And that is not the case here. The court in the underlying tort suit had no occasion to weigh in on whether the policy had been properly cancelled due to Joelyn's failure to pay premiums.

¶132 Second, an insurer that breaches its duty to defend is subject to paying any damages that are the result of that specific breach. *See Signature Dev. Cos. v. Royal Ins. Co. of Am.*, 230 F.3d

1215, 1222 (10th Cir. 2000) (applying Colorado law and stating that "when an insurer breaches its duty to defend, the insured is entitled to receive compensation for any prejudice the insured may have suffered as a result of the breach"). Often, any attorney fees incurred in the undefended lawsuit are recoverable as compensation for breach of the duty to defend. *See, e.g.*, *Polaroid Corp. v. Travelers Indem. Co.*, 610 N.E.2d 912, 921 (Mass. 1993) ("Certainly the insurers are liable in contract to [the insured] for its defense costs (up to the time that it was determined that the [plaintiff's] claims were not covered by the various policies)."). Beyond that rather obvious component of damages, insureds may recover other types of damages as well. *See id.* at 922 (stating that "an insurer should be liable for the natural consequences of a breach of contract that places its insured in a worse position"). It is theoretically possible, for instance, that in certain cases "an obligation to pay settlement costs could result from a breach of the duty to defend." *Id.* Or, "if an insured lacks financial resources sufficient to maintain a proper defense, an insured's losses in the underlying claim could well be the result of a breach of the duty to defend." *Id.* Ordinarily, an insured's attorney fees incurred in the second case—the coverage case—are not causally linked to the breach of the duty to defend, because those same fees would have been incurred in a declaratory judgment action filed at the outset even if the insurer had acted appropriately and filed one. However, in some cases, it may be possible for an insured to demonstrate that attorney fees incurred in the second case—the coverage case—are causally linked to the insurer's breach of the duty to defend. *See, e.g.*, *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485, 1495 & n.15 (5th Cir. 1992) (applying Texas law and determining that "the findings for which we remand this case would have been made had the insurers fulfilled their duties to defend" the insured and, as a result, the insurer would be obligated to pay the insured "its reasonable costs and attorney fees for defending its side of the allocation determination on remand"). Furthermore, an insurer that breaches a duty to defend may also be subject to consequential "damages for injury to

reputation or credit rating, [or] damages for emotional distress." *See Campbell v. State Farm Mutual Auto. Ins. Co.*, 840 P.2d 130, 139 (Utah Ct. App. 1992), *cert. denied*, 853 P.2d 897 (Utah 1992). But such damages inquiries are to be viewed not through the lens of estoppel but, rather, through the lens of "normal contract damages principles." *See Polaroid*, 610 N.E.2d at 921; *see also id.* at 921–22 ("Even when an insurer's conduct is unfair or deceptive . . . , the insured must prove that the insurer's conduct was the cause of any loss it sustained.").

¶133　In this case, the trial court determined that Jared had not borne his burden of demonstrating that he had sustained damages that were directly linked to Farmers Insurance's breach of its duty to defend. As the majority correctly notes, *supra* ¶ 28, "we review for an abuse of discretion the trial court's determination that [a party] failed to introduce sufficient evidence to establish damages, and we will not overturn the trial court's decision unless there was no reasonable basis for [that] decision," *Macris v. Sevea Int'l, Inc.*, 2013 UT App 176, ¶ 26, 307 P.3d 625 (quotation simplified). On the record before us, I perceive no abuse of discretion in the court's damages ruling, and I would affirm it on that basis.

——————